# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MARYLAND

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2014 DEC 24  PM 2: 14

CLERK'S OFFICE
AT GREENBELT

BY_____DEPUTY

|  |  |  |
|---|---|---|
| JOSEPH R. CRUSSIAH | * | |
| Plaintiff | * | |
| | * | |
| | * | |
| v. | * | Civil No. TDC 14 cv 4017 |
| | * | |
| INOVA HEALTH SYSTEM | * | Complaint |
| | * | Jury Demand |
| | * | |
| Defendant, | * | |
| | ***** | |

## COMPLAINT

Plaintiff Joseph R. Crussiah for his complaint against Defendant Inova Health System, state as follows:

## NATURE OF THE CASE

1.  This is an action arising under the laws of Virginia, governing: fraud, defamation per se, defamation, malicious prosecution, false imprisonment, tortious interference with a contract and with business expectancy, civil conspiracy, intentional infliction of emotional distress. Additionally; the laws of Maryland, governing: fraud, defamation per se, defamation, tortious interference with a contract and business expectancy, civil conspiracy, intentional infliction of emotional distress.

2.  This pleading is lengthy because Plaintiff asserts that Defendant; has acted, is acting and will continue to act in a manner that is evil, malicious and oppressive; upon the Plaintiff.  In addition to proving the plausibility of this degree of severity, the Plaintiff has to overcome the deference and reverence afforded the Defendant.  The Defendant's misconduct is lengthy and appropriately, a pleading that reflects that misconduct is lengthy.  Defendant is represented by a team of no less than seventeen attorneys; the Plaintiff is acting Pro Se.  Defendant has committed every last penny of $2.3 billion in annual revenue, the source of which is primarily the taxpayer; to oppressing the Plaintiff.  The Plaintiff is filing; in forma pauperis.  Plaintiff hopes that the length and depth of the pleading would contain sufficient facts to answer Defendant's motions.

3.  The Plaintiff would have had a strong medical malpractice case against the Defendant. A third party in Maryland would have been a co-defendant.  The third party is a medical professional but not a physician.  With a medical malpractice case, a plaintiff must obtain certification from an expert that what he alleges is meritorious.  The third party in Maryland conducts business on the fringes of the law.  One of the principals of that business is a convicted felon.  He defrauded some physicians and veterinarians in a business deal.  Plaintiff contacted two of the victims; a physician and a veterinarian.  Plaintiff presented the facts to them; that

focused on the actions of the third party.  Normally; such individuals would not comment on issues involving medical malpractice.

4.  The veterinarian, who is also an officer in the U.S. Army emailed (Exhibit 2) this:

"As (a) veterinarian, I can see many issues with the protocol that was performed on you and I can say from a vet point of view, this person would have their license revoked".

5.  The physician, who is also a professor at NYU Medical School, emailed (Exhibit 1) this:

"It appears that there are many issues, legally, administratively and medically" "I wish you success in your pursuit of justice and good health".

6.  A reasonable interpretation of the latter quote is that Plaintiff's health was harmed and done so, in an egregious manner.  As a consequence Plaintiff needs both; medical care and justice.  Defendant is obstructing the justice process, using the means of; obstructing the medical care process.

7.  **The malicious and oppressive methods by which Defendant has conducted this evil scheme, is conducting this evil scheme and intends to conduct this evil scheme; has caused Defendant's "insiders" to resign.**

8.  Defendant is a giant healthcare monopoly with 16,000 employees.  The organizer of the evil scheme against Plaintiff is a single physician; an individual Plaintiff has never seen or spoken to.  He is the head of a neurology practice.  In addition to the Plaintiff's treating neurologist, four other neurologists are his subordinates.  These four physicians were being forced to participate in the oppression of the Plaintiff.  **Three out of four, of their own physicians, resigned, abruptly, in unison.**  All three left behind their positions as both neurologist at the practice and as associate professors at VCU Medical School.  These physicians, all moved out of the Washington, DC area, to lesser positions, in locations, such as

Central PA.  Such an action never occurs at a medical practice.  It **occurred** here, **because** of no

other reason than; those **physicians wanted to heal patients and not bury one, alive**.

9.  When harm occurred to Plaintiff, The Defendant concealed the harm; in an effort to

obstruct the prosecution of such a case.  Additional harm resulted because, of no reason, other

than, that the Defendant was concealing the prior, harm. The Defendant altered the medical

records that had previously, existed. This commenced Defendant's, "bury the patient, alive"

strategy; conduct that is evil, cruel and unethical. In an effort to distract the Plaintiff from the

facts, the Defendant prescribed a drug for a condition, which the Plaintiff did not have, and this

resulted in additional injuries. Defendant recommended a procedure that would have resulted in

more severe injuries. Plaintiff protected himself and did not follow that recommendation.

Plaintiff suffered additional injuries during a simple dental procedure because Defendant

concealed facts.

10.  Every, single, action of the Defendant bore evidence; that the Defendant had willful and

wanton disregard for the plaintiff's health and life. The plaintiff had made great strides in

unraveling the concealment.  As is normally the case, with a cover-up that is uncovered; the

Defendant would have faced additional allegations and great erosion in credibility. The sole,

cause of action continued to be medical malpractice. This should have been the end of the line

for the Defendant.

11.  Defendant was undaunted, instead; contrived and executed evil schemes, in a malicious

and oppressive manner, for the purpose of obstructing the prosecution of medical malpractice

litigation. Whenever the Plaintiff would overcome those evil schemes, the Defendant would, in

turn, respond with conduct that was even more evil.  The only thing that the Defendant has not

done is to hire a "hitman".

12.  Defendant was able to control the concealment when Defendant's employee was the Plaintiff's treating physician. Even; after Plaintiff filed a complaint with the Physicians' Board, Defendant did not terminate the relationship, as is customary.

13.  Defendant committed extensive fraud within the health records. Defendant, actively, sought to find the identity of Plaintiff's future physicians. Defendant has "gift-wrapped" Plaintiff's health records with a cover sheet; a one page long defamatory letter. The contents are 100% false. The contents are meant to cause shock and fear, such that; another physician would not fulfill that physician's contractual obligations to the Defendant.

14.  Following the termination of the doctor-patient relationship, between the Defendant and the Plaintiff; Plaintiff attempted to establish contracts with some physicians, near his home is Silver Spring, MD. There was an embargo against him. The situation is not as overt, as; "school doors being chained". The behavior of these physicians and their agents is similar to; that of those engaging in housing or employment discrimination.  These individuals go through the motions, but the outcomes are breaches of contract.

15.  It is commonplace that when the patient's present physician finds that a physician in the past committed harm; the present physician does not ever aggressively, assert that the previous physician did something wrong. Substance is not concealed, though; simply that "diplomatic" language is used. Plaintiff's medical history was such that the maladies for which he formed the doctor-patient relationship with Defendant's employee was that; he was at one time, harmed by negligence of a physician and later; some other condition developed in the course of treatment with other physicians. Defendant's employee followed that accepted method; of using "diplomatic" language, yet not concealing the substance.

16.   When the cause of action is medical malpractice, the law, appropriately, requires the opinion of experts.  That is not the cause of action in this filing, yet Plaintiff will not ask The Court to assume the role of medical expert.  Some concepts within the practice of medicine are within the scope of the reasonable person, who is not a physician.

17.   A medical school student is given the M.D. designation after completion of four years of medical school.  Some additional training is required prior to becoming licensed to practice medicine.  Testing for the licensing exam, USMLE, is a 3 Step process.  Step 1 occurs following completion of the second year of medical school.  Up to this point, it is all classroom instruction and no practical.  The student is supplied with a fictional patient's history, this is; past medical history and patient's present, subjective, complaints.  Additionally, the student is supplied with the findings of a physical exam.   The student is expected to make a conclusion about a diagnosis.  The same student, just prior to the completion of medical school; takes Step 2 of the USMLE.  This time, the student has gone through the practical, but is still not a physician.  Actors are used to simulate an encounter between physician and patient.  The entire encounter is to take twenty five minutes.  During the first fifteen minutes, the student is to gather history from the actor/patient and to conduct a physical exam.  During the final ten minutes, the student is to; come up with clinical diagnoses wherever possible, order tests and complete the record keeping task.  "Clinical diagnosis" is the term that physicians often cite when bemoaning the "malpractice crisis".  Physicians say that their education, training and experience allow them to diagnose most patients without "electronic testing".

18.  When a physician does not record the history; that simply has to be recorded as the patient reported.  When a physician does not incorporate results of subjective testing; that revealed abnormalities.  When a physician releases records that completely omit even the most

6

basic notes from a physical exam; weight, blood pressure heart rate.  Physical signs present on

the patient's body with some conditions.  When a physician fails to note these signs, even

though; the patient has pointed out the obvious.  When the patient even has a seven minute long

recording of a specific sound heard from the lungs and a physician with a stethoscope claims that

the physician did not hear the sound.  When a patient has engorged, superficial veins on the

entirety of his upper chest and the physician records that the finding is limited to the upper left

arm.  When a physician releases a record with a weekend timestamp, as a substitute for there

separate weekday encounters.  Then, claims that he only releases a consolidated, single report;

even though; the date of the report precedes the final two encounters.   When a physician tells the

patient that he has a specific condition but will not report it on the records. These were some of

the actions of two physicians with whom Plaintiff entered into the contract of medical care,

directly; with no involvement of an insurer or government.

19.  When all this occurs, a person who is not a physician, will reasonably conclude that these

are intentional breaches to his contracts.  Done so; at the behest of the Defendant and not some

mere sympathetic, professional courtesy to the Defendant.

20.  Plaintiff formed a 3 way contract with a third physician.  Medicaid, the federal

government agency that funds medical care for the indigent, is the third principal in this contract.

That physician, essentially, lassoed the Plaintiff with the "bury the patient alive" device of the

Defendant and hung the Plaintiff with it.  In order to commit these acts, this physician defrauded

Medicaid and the taxpayer.  Using taxpayer money to fund it's arsenal, for the purpose of

oppressing the Plaintiff , was another device of the Defendant.

21.  Plaintiff suffered physical injuries at the hands of the Defendant; yet Plaintiff never

sought legal action against the Defendant.  Plaintiff had not worked for several years as a

consequence of the medical condition that pre-dated the harm by the Defendant. Plaintiff was committed to the job search process (Exhibit 30A-D); jobs where he would get accommodations for that malady. Plaintiff wanted all the subsequent benefits of employment, as proclaimed by the ADAAA of 2008. There would have been an additional benefit to working and then following the "normal life" path. The Plaintiff was promised by his family that $1,500,000 in real estate would be transferred to his name, once those goals were reached. Plaintiff, even when; he complained to the Physicians' Board, simply wanted Defendant to treat his maladies and what was untreatable, note those on the records, so that; Plaintiff would get appropriate accommodations at work. Some of the symptoms, like profuse sweating is a job interview, killer. It is assumed that such an individual is incapable of basic hygiene. Additionally, a sign of untruthfulness.

22. Defendant is a non-profit health care entity with $2.3 billion in annual revenue. Rather than acquiescing to the Plaintiffs simple request; Defendant committed all of those billions, if necessary, to bury the patient; alive. Defendant convened a "death panel", including a contingent of its own physicians from several divisions. This panel met several times, for hours at a time. Times in which they were needed to provide care to patients.

23. **When dissenters within Defendant's own employees, resigned; there was no one remaining to, at least, somewhat, restraint the Defendant**. Defendant's head-of department promoted Plaintiff's treating physician, the one that that harmed the patient before that "death panel" was assembled; into the position held by one of the physicians who resigned. The position was the director of a mentorship program, at Virginia Commonwealth University School of Medicine's Fairfax Campus.

24.  The Plaintiff complained to the appropriate parties at that state institution.  Plaintiff had standing to complain, both as a citizen and the fact that one of their students participated during his initial encounter.  Defendant corrupted the complaint process.  Within three hours, Plaintiff received an emailed letter (Exhibit 3) from Defendant's counsel, stating; Plaintiff had committed defamation.  Defendant's ethos is well revealed.  Defendant ordered that; Plaintiff must cease and desist from communicating with Defendant, VCU, the Defendant's employees, individually and VCU's employees, individually.

25.  Defendant is in the business of issuing edicts.  Defendant had no right to make orders on behalf of VCU, who Defendant's Counsel did not represent, nor with any employees, individually.  Plaintiff; replied (Exhibit 4) and stated these preceding points.  Plaintiff, further, requested that Defendant's counsel support his allegations.  Plaintiff, not only sent all the communications to all parties, again; he also sent it to four local news agencies. The reply that Plaintiff sent included a statement that Defendant's counsel, himself, was a part of the "death panel".  This time there was no reply from Defendant.

26.  Plaintiff, being indigent; would need an attorney to accept his medical malpractice case, on a contingency basis.  Typically, the first two elements of such a case, is to where, the attorney invests capital.  These elements are proving that the medical practitioner had a duty and that the practitioner breached that duty.  A medical expert is needed to, often times, take thousands of pages of records and find the one or two "needle in a haystack" items and then present them in a light favorable to the plaintiff.  In this Plaintiff's potential case; the records are short, the Plaintiff has already identified the pertinent matters, the Plaintiff engaged the Defendant and there is a paper trail of written communications.  These assets of this potential case, more than offset the liability; that the fourth element, economic damages; needs a little work.  Plaintiff was not

9

employed and has no dependents. Plaintiff was actively in the job search process and was employable, with some accommodations for his workplace disability that had existed. This would have required the opinion of a vocational expert and such an expert charges, considerably, less than what would be charged by a medical expert for "research and development". The Plaintiff's medical malpractice case would have also included another party, an MRI provider in Maryland. The MRI provider, in the course of conducting a test ordered by the Defendant, caused severe harm to the Plaintiff. Defendant committed additional harm and issue of dividing the responsibility between the two defendants would be; theirs, to present. The Plaintiff's has at least one "ticking time bomb"-type injury. Medical costs could exceed a million dollars. The best doctors, likely don't participate in Medicaid. Additional assets are: current and future "pain and suffering", punitive damages, the possibility of obtaining damages in two states.

27. Defendant assembled a risk management team to study the issue. Apparently, Defendant recognized that the case against the second defendant was the stronger case, for the Plaintiff. That second defendant had committed a crime; that the second defendant was already operating on the fringes of the law; that this second defendant has no financing for its defense other than malpractice insurance; that this second defendant would simply settle. Once the Plaintiff retains an attorney to prosecute the second defendant, the prosecution would not stop at that second defendant. Defendant's large team of experts determined that an attorney would take the Plaintiff's case on a contingency basis.

28. Defendant thought that Plaintiff could win the third element, of showing evidence of severe harm. This is the reason that Defendant is steadfast, in blocking Plaintiff, in getting even a basic level of health care. All that the Plaintiff needs is, that, standard physical exam; done correctly.

29.  Normally, once medical malpractice action has been commenced; then the insurer organizes an effort, bringing in the insurers own consultants and such to essentially, misrepresent facts, such that Defendant prevails at any point within that process.

30.  There was no medical malpractice action.  Defendant's employee was the Plaintiff's sole treating physician to whom Plaintiff reported his malady.  Defendant's pre-standing policy was to conceal harm and cause more harm.  The treating physician executed this evil policy. Defendant took the additional step of organizing a "death panel" and forced its own physicians to participate in conduct that directly caused additional physical injuries to the Plaintiff.

31.  Defendant has proclaimed that entities such as VCU [a large public university system] and private individuals, whose only connection to Defendant is an employment contract; are all to obey the orders of Defendant and Plaintiff must not even contact them.  Defendant even speaks on behalf of unnamed third parties.

32.  Defendant has ordered that Plaintiff cannot contact Defendant.  An oppressive policy; Defendant is not some small business but a healthcare monopoly.  With this order, Plaintiff could not contact or visit a family member, admitted to a hospital.  The Plaintiff could not receive emergency medical care, even if; it is a fire department that transports him there.

33.  Defendant placed fraudulent information within Plaintiff's health records, records that will be read by Plaintiff's physicians.  Defendant designed and executed a scheme to relay a defamatory statement to Plaintiff's physicians.  Plaintiff's physicians executed Defendants "bury the patient alive" mandate.  It was uncharacteristic of Plaintiff's physicians in Maryland to; bury their patients, alive, violate professional ethics rules and commits felonies against the federal government.

## THE PARTIES

34.  The plaintiff, Joseph R. Crussiah is 44 years old and a Maryland resident and a resident of Montgomery County.  The plaintiff had a medical condition and had not worked in several years.  The plaintiff resides in the Washington, DC area and possesses a 4 year college degree. His disability would have limited him to a 6 hour workday, with the typical desk job, a job similar to the one where he last, worked.  In 2013, at age 42, the plaintiff was actively seeking to become employed.  In consideration of the need for that workplace accommodation, the plaintiff limited the job search to entry level government jobs.  All job markets are cyclical and the plaintiff would have started working, at some point. Even if it took 3 years to accomplish that goal, at age 45; the plaintiff could have worked for at least 25 years.

35.  With employment; Plaintiff would gain in stature, have the income to start a family, have the income to own a home. The plaintiff had not sought medical care in several years, because physicians were responsible for the existence of his medical condition.  In 2013, the plaintiff sought medical care, in hopes of reducing the need workplace accommodations.

36.  Defendant, Inova Health System is a not-for-profit health care entity.  Inova was originally a single, for-profit hospital located in Fairfax, Va.  The conversion of its business status has allows Inova to receive, the obvious, an exemption from taxes.  Additionally; favorable treatment that has allowed it to buy-up, nearly all other hospitals in Northern Virginia. Inova has bought-out, nearly, all the doctors' offices within Northern Virginia.

37. Some of the justification for favorable treatment is quoted from Inova's website:

A. "Inova's service promise is that we seek every opportunity to meet the unique needs of each person we are privileged to serve- every time, every touch".

B. "Mission is to improve the health of the diverse community it serves through excellence in patient care. Vision is to seek to optimize the health and well-being of each individual we serve".

C.  "As part of Inova's not-for-profit mission, Inova, in the Community's Access to Care programs ensure all members of our community can access much needed healthcare services".

12

38.  Inherent to any health care entity is that it adhere to The AMA Code of Ethics.

39. Contrary to promises, Inova's commitment in not to patients, the community and the taxpayer; but to itself, even more so to their management level physicians.  Inova's physicians may harm patients, at will. Some guidance comes from the federal governments' rules, when it is the payer. The standard is that the health care entity is to first report the injury and then to bear the cost of injuries to patients.  The reasonable expectation is that Inova would discipline their physicians for mistakes and certainly, for misconduct.

40.  Instead; Inova funnels taxpayer money into not simply providing a legal defense for their physicians, but for hiring consultants and such who devise schemes that conceal harm.  Concealment results in additional harm to the patient; the economic costs borne by; the patient, the community and the taxpayer.

41.  Inova hired John Cochran, M.D. to the position of "head of practice" at a doctors' office that it owns; Inova Alfa Neurology.  Dr. Cochran has one or more personality disorders and as a consequence, no worthy neurologist wants to work for him.  Those who do, quickly, depart. (Normally, there is great stability at practices where a group of specialists practice.  Specialists commit the duration of their careers to a single practice).  Consequently; Dr. Cochran hires neurologists that other practices, do not.

42.  The physician that treated the patient, Sonalee Kulkarni, M.D. began her career as an ophthalmologist.  She failed in that specialty and completed a neurology residency.  No neurologist found that Dr. Kulkarni was worthy of employment in the position of a neurologist. Six years went by and then Dr. Kulkarni was hired by Dr. Cochran.  The curriculum vitae, of one of the other neurologists is that he went to the Soviet Union to complete medical school.  It took him 10 years to complete schooling that takes 4 years to complete in the U.S.  The following 10

years is a void and then; he is hired by Dr. Cochran. Dr. Cochran, further benefits, personally, because there is no competition to unseat him.

43. The Plaintiff is not suggesting that these physicians are incompetent or unqualified. The problem is that these physicians are beholden to Dr. Cochran for their livelihood. Dr. Cochran has standing orders to these physicians: (1) run-up the bill: Dr. Kulkarni ordered $11000 in tests for the plaintiff who was unemployed and uninsured. The patient did no follow through with the more expensive tests, as they were unnecessary. A day/night sleep study was ordered, costs $6000 and was to be conducted at the Defendant's practice. The test simply involves having their employee observe a patient as he sleeps. Apparently, all patients at this practice get orders for this test. The other testing is to be conducted by independent providers, but the Defendant would get credit for the referral. (2) after, essentially, making a "killing" up front, don't get involved with the complexities of , actually, treating the patient. A few short office visits pay only a tiny fraction of what the lengthy initial visit and tests; would pay.

## JURISDICTION AND VENUE

44. This court had jurisdiction over the Plaintiff's claims pursuant to 28 U.S.C. 1332. Upon information and belief, the parties are diverse and the amount in controversy exceeds $75,000. Venue in this district is proper.

## FACTUAL BACKGROUND

45. January 24, 2013: The Plaintiff and Sonalee Kulkarni, MD established a doctor-patient relationship. One of the tests, ordered, was MRI head, with and without contrast. February 15, 2013: The Plaintiff underwent what should have been a simple and trouble-free test at Capital Imaging, LLC of Bethesda, MD. They advertise, the lowest price in town, yet located in a high-rent district. This facility is the operation of Mr. Patrick Jackson; an individual with no medical

14

training, a career of fraudulent schemes and a recent felony conviction for defrauding physicians and veterinarians, including a veterinarian in Honduras. The single felony conviction and 0 days jail were part of a plea bargain. Mr. Jackson had actually, faced 10 or more felony charges and at least 5 years, per charge. Mr. Jackson kept his end of the plea bargain, by paying restitution to his victims. This story is reported in news stories, online. Money; that was, likely, given to him by two physicians that are part-owners in Capital Imaging, LLC. One operates a medical practice on the top floor of the building and is thus able to sign off that he is available to tend to matters requiring the talents of a physician. The second physician, Dr. Athas "signs off" that he is the medical director. Dr. Athas, a radiologist, is physically in Queens, NY and makes the same claim for a MRI facility in Northern NJ. The felony conviction is related to Amerisource Medical, a post office box operation, run out of a UPS Store in Columbia, MD. There was another business that Mr. Jackson, operated out of a UPS Store in Columbia, MD. This one was titled Capital Imaging, INC. In 2005 Capital Imaging INC became defunct and Capital Imaging, LLC was formed. This is no mailbox operation, but a medical facility, where patient care is involved. Albeit, a very tiny facility, offering nothing more that a single MRI machine and no other type of testing. Their parking lot has spaces reserved to fictitious names (Jones, Smith, Johns etc.).

46. The tech (Antonio Macayayong Papel) is licensed but the first name is different, Manuel in drivers' license and other official records. First licensed as a radiographer in Maryland in 1995, but no one hired him in that position. Prior to joining Capital in 2005, he worked for many years with Quest Diagnostics as a phlebotomist. Mr. Papel has great knowledge and skill in the art of administering injections. The plaintiff had symptoms, such as; numbness and dizziness in the head and the test was trying to find a cause. Sometimes, the source of such symptoms,

originate from outside the head, either; with the heart or the large arteries that supply blood to the brain. This problem was present with the Plaintiff, so when Mr. Papel injected the full dose [the material is gadolinium and it helps to produce a better image] via a vein in the arm, carried to the heart and then dispersed throughout the body.   Sufficient gadolinium was present in the brain for the 1st set of post-contrast images but sufficient gadolinium was not present for obtaining the second and third set of images. The source of the symptoms was found; testing in those areas would have been recommended.

47. Mr. Papel was bound and determined to obtain those final two sets of images, by all possible, means. Mr. Papel, put on an act, feigning that the vein shut off and that only half had been injected, when truly, there was no problem with the injection, itself. Mr. Papel, intentionally, injected an artery in the left hand, attached an extension line and shot up, with great force, a large volume of gadolinium, saline and other unknown materials [Physiology is that, an artery in the arm is propelling blood with great force, downstream. Sometimes, by mistake an artery is punctured.  Blood would spurt and would be carried back into the syringe.  If the technician, persisted; the contrast material would infiltrate the muscle in the arm and result in pain and swelling in that arm].

48. Mr. Papel's conduct occurred in a medical setting and within the course of a medical procedure, and appropriately, the Plaintiff is entitled to a medical malpractice cause of action. Mr. Papel's technique reversed the direction of blood flow. This "fire hose" technique is so aberrant that lab animals are not sacrificed, with such a procedure. This technique may have been conducted as an experiment in a death camp and would have, rightly, been viewed to be a war crime.

49.  The evidence (Exhibits 7A-7H) from a CD created by Mr. Papel, with images of the
testing, reveals that; the contrast sequences took 90 minutes, rather that the 10 minutes that are
allotted.  The exhibits are explained within paragraph 50.  Normal practice at this facility is that
after the final images are produced, the technician asks the patient to wait in the reception area.
The tech takes 10 minutes to assemble the images and then gives a CD to the patient. The CD
reveals that there was a 60 minute period of no activity, following the final set of images. At the
conclusion of the plaintiff's stay in the exam room, Mr. Papel was tying to get the plaintiff to
answer in complete sentences.  This is the protocol, when it is suspected that there are injuries
consistent with the brain being deprived of oxygen.  The only explanation is that the plaintiff was
unconscious for 60 minutes and Mr. Papel did not seek help. The BCC Rescue Squad is 100
yards away and Suburban Hospital is 5 blocks, away.

50.  The MRI machine has a sealable capsule.  The patient lies on a tray and it is slid into the
capsule. The device has multiple cameras and can take more than twenty images within a
fraction of a second.  The tech takes about two to three minutes to position the patient and the
cameras, then; those images are snapped.  For the MRI of brain about eight different sequences
are performed and thus the testing takes about twenty four minutes. The FDA states this is
sufficient and images taken with contrast are not truly needed.  There are some known
complications with the contrast procedure, in certain patients.  The Plaintiff was not in that
group.  Up to three more sequences are completed post-contrast.  The images bear an imprint.
Sequences 9,10,11 bear the imprint, either; Post, Contrast or C.  For a given sequence, all the
images bear nearly the identical timestamp and thus only a single image per sequence is entered
into evidence.  Mr. Papel was averaging 2.5 minutes per sequence and it took a few additional
seconds between the eight and ninth sequences.  This is when the tech opens the hatch and

infuses the contrast into a catheter already in place, in the arm. The Plaintiff made an enquiry of Capital Imaging, using a fictitious name and they confirmed that the contrast is administered, all at once. Had a vein shut off, the tech would never have commenced with sequence 9. Following sequence 9 is where Mr. Papel commits those crimes; from sequence 9 to sequence 11 takes sixteen minutes, when it should have take five minutes. There is Sequence 12 or Sequence 99. These contain images known as "scout images". These images were obtained at 01:05 p.m. with the first sequence. At the conclusion of the test, the tech selects some of these images and at this time, the MRI machine, stamps a new time, superimposed on the existing timestamp. There is no fraud in this. The superimposed timestamp is for 02:50 p.m. This is sixty five minutes following Sequence 11. It should have been no more than ten minutes. The same timestamps are more clearly visible when the file is opened with Microsoft Wordpad (Exhibit 7H). "TM" indicates time and the 1450 time is clearly visible.

51. The technician is supposed to send a copy of the images to a radiologist; a physician that is a specialist in interpreting, such images. It appears that Mr. Papel, himself, produced this document (Exhibit 7A) and forged the radiologist, John Athas's signature. The document is signed "**electrically**" signed by John Athas MD, Board certified radiologist". Mr. Papel's is not the most proficient with the English language and Dr. Athas was trained at Columbia and Harvard. Had, Dr. Athas produced that document, the correct word would be "**electronically**". There would be a template that he would use and it would list his credentials in more detail, at a minimum; identify the board by title. Although, Dr. Athas is involved in a scheme where he operates on the fringes of the law, Mr. Papel did not think that Dr. Athas would support the crime that Mr. Papel, committed. Had the patient died, the crime would have been involuntary manslaughter.

52. Objective evidence of severe injuries: A sonogram study (Exhibit 28 A-I) revealed that the veins in the arm, never "shut off". They were normal. The same study revealed that there is stenosis in the ulnar artery of the left arm. There are abnormal readings in the axillary artery on the left side. The axillary artery is connected to the subclavian artery and there is low flow and other abnormal readings. The subclavian artery is connected to the aorta.

53. A CT scan reveals that there is an aneurysm in the ascending aorta (Exhibit 27 A-F). Cedars Sinai website explains the terminology (Exhibit 33). The ascending aorta is the largest artery in the body. It is the pipe arising from the heart, that starting point for blood that is to supply the entire body. On May 27, 2014, that aneurysm measured at 4cm. The actor John Ritter had the identical size aneurysm in the ascending aorta. Two years later, it dissected and caused his death. The emergency room thought that Mr. Ritter was having a heart attack. For a heart attack, one of the treatments is that the aorta is dilated. Unknown to the ER, they were inflating the already weakened and bulging aorta. It is described as very painful, death. If the patient survives, the cost easily exceeds a million dollars.

54. An identical CT was performed in 2009. The 2014 CT revealed that calcification within some of the brain arteries found in 2009, no longer existed. Instead new calcification was found at the left ear and in the lower back. Mr. Papel completed the final two sequences. He was successful in getting gadolinium into the brain, but his actions produced a landslide that starved the brain of blood. This caused the plaintiff to become unconscious. That landslide dislodged calcifications. That landslide would return to the heart via the Superior Vena Cava. This vein is a large pipe that connects to the heart. All the used blood from the upper half of the body is returned to the heart, via the SVC. Normal anatomy is that the exteriors of the SVC and the ascending aorta are in physical contact. As a consequence, abnormalities in one; may cause

19

abnormalities in the other and some of the symptoms, such as hoarseness after speaking, are identical.

55. When the SVC has a significant obstruction; the patient will present with a condition called Superior Vena Cava Syndrome. Some of the blood backs-up into the head and swellings appear on the head. The most noticeable is "periorbital edema" [new swellings below the eye, not bags]. The plaintiff presents with this exact sign. Jugular Venous Distention is another sign that appears on the plaintiff. The sign that is most diagnostic and specific to SVC Syndrome is "collateral veins". The body, on its own; takes existing veins, that normally are, mainly, dormant and converts them into a network of veins, that bypass the blockage. Diagnostic testing is needed to reveal this network. Sometimes a pattern of superficial veins appear on the upper chest and in such cases, a clinical diagnosis will be made; diagnostic testing would be optional. The Plaintiff has engorged superficial veins on both sides of his SVC, more prominent on the left. On the left side, a narrow superficial vein is seen emptying blood from the jugular vein on the neck [normally the jugular would carry used blood to the SVC, which would return it to the heart]. That narrow vein travels to the left shoulder, at that point it becomes much bigger [some other veins also emptying here, but not visible], then that bigger vein goes directly to the heart. The resting blood pressure had risen from 124/74 [normal] to 164/90 [significant high blood pressure]. The resting heart rate was already elevated at 90 because of the pre-existing condition, now; increased to 108 and a rate above 100 is significant and is labeled, "tachycardia". Two pulses are normally felt in each arm, the radial and the ulnar. The ulnar pulse cannot be felt on the Plaintiff's left arm.

56. March 26, 2013: Plaintiff had a doctor's appointment with Dr. Kulkarni, for the purpose of evaluating the new condition. Mr. Papel had, essentially, blown-up and injured the entire

circulatory system of the plaintiff, but at the time, the new symptoms were simply thought to be a small addition to the condition that pre-dated the procedure. It was a miracle, first that the Plaintiff survived and second that the mountain of injuries caused no significant alteration to previous symptoms. All that the Plaintiff had noticed was cold fingers and toes and the swellings below the eyes. Additionally he reported to Dr. Kulkarni that the tech said that a vein shut off, at the time, not knowing what that meant. The Plaintiff told Dr. Kulkarni that he was confused about why the tech was trying to get the plaintiff to answer in complete sentences, because that is what is done when someone suffers a stroke or something.

57. The plaintiff was in the job search process and that endeavor, continued forward. (Exhibit 30 A-D)

58. Dr. Kulkarni's duty was to identify all the injuries. Dr. Kulkarni, easily, understood, what had happened. Dr. Kulkarni was in a physical state of panic throughout the visit. She was pacing, shuddering and made the sound of fear with her mouth. Dr. Kulkarni was conflicted between practicing medicine and succumbing to the fear, instilled in her, by her employer. The only time that Dr. Kulkarni relaxed was when she took the plaintiff's left arm and checked for pulses.

59. Dr. Kulkarni said that the plaintiff, "misunderstood" what had happened at the MRI facility. Dr. Kulkarni changed the subject. Dr. Kulkarni tried to get Plaintiff to recant two of his pre-standing abnormalities. The two were medical signs that are found in patients with certain cardiovascular conditions. Dr. Kulkarni began to treat for migraines, that her own records, say; resolved in 2005 (Exhibit 9A, 13A). Dr. Kulkarni's panicked state continued, after, the visit concluded. Dr. Kulkarni spent 20 minutes to alter the records from the first visit. **She, boldly,**

**deleted the order for the MRI test** (Exhibit 9D).  Normally, when physicians alter the records, they seek to bolster the rationale for ordering a test that went awry.

60.   In May 2013, in an effort to maintain the dishonesty, Dr. Kulkarni prescribed Verapamil for migraines. This drug is contradicted in patients with several different cardiovascular conditions and the plaintiff suffered additional harm.  The actions of this drug are exclusively upon the heart and the plumbing that circulates blood throughout the body.  When performing a Google Search with the word "deleterious" combined with names of various drugs; results with both of those words appearing in the same article are almost non-existent.  When the words "deleterious" and "Verapamil" are searched, together; several medical journal articles appear. The common theme in these articles is that Verapamil causes deleterious effects in some patients. Researchers are usually unable to determine the exact mechanism by which Verapamil caused harm.  They often conclude that a cardiovascular abnormality was "teetering" and that Verapamil pushed it over the edge.

61.   Verapamil did just that; Mr. Papel's actions caused severe harm but produced virtually no disability. The plaintiff sent a letter to Dr. Kulkarni in July, 2013 (Exhibit 20A,B,C): The patient, patiently, waited 2 full months, hoping that the condition would improve.  It did no and a letter was sent.  The contents within the letter were: (1) a re-statement of the original symptoms (2) puzzlement about why the physician seemed not to understand the issues (3) the patient accepting responsibility for perhaps not conveying the issues in an understandable manner, a conciliatory gesture (4) concern that physician maybe, inappropriately, attributing the symptoms to some psychiatric condition (5) suggestion that the physician could opt out of reading the entire letter and limit the reading to the 7 minutes that discussed the 2 complications and the correct interpretation of the Doppler study  (6) noted that the patient would like to schedule an

appointment for September, if the physician is willing to resolve the key issues, otherwise, the patient would simply move on to another physician.

62. Practice responded (Exhibit 21, all messages, except the top one): Two weeks following receipt of the letter, both, email and telephone responses from a practice manager, Mr. Randy Lewis. Normally, a nurse is to be the liaison between doctor and patient. The practice manager is an agent of the head of the practice, Dr. John Cochran. Dr. Cochran had assembled that "death panel", unknown to Plaintiff at that time.

Mr. Lewis was to make a set of false promises. Mr. Lewis' exact words from the emails:

"My name is Randy Lewis, I am one of the managers with Dr. Kulkarni's group. She received your letter and is reviewing it to addend your record. If we have any questions we will contact you, in the meantime we can schedule for you a follow-up appointment for sometime in September, please let us know what days and times work well for you. Please let us know if there are any additional questions and we will start working on this for you".    A voice mail began with "like to touch base with you".  Some phone tag, an email from patient to Mr. Lewis, then another email quote: "Nothing else at this point. Dr. Kulkarni has created an addendum for your records, she said she will discuss/review the other items in your letter at the time of appointment and can more clearly respond and answer any questions. Thank you, see you soon"

3rd and final visit-

63. No intention of keeping promises, no medical purpose, nefarious motives.    In those journal articles, discussing the deleterious effects of Verapamil; there is no breach of the "standard of care", involved. Verapamil was prescribed out of necessity. Those physicians conducted a thorough exam of those patients prior to prescribing this drug. Then when, harm occurred; they were free to acknowledge that harm had occurred and to link the harm to that drug. The reporting included whatever the patient, said. The reporting included obvious signs that presented on the patient.

64. Dr. Kulkarni was in a much different position. She prescribed the drug, as a distraction. Additionally; rather than conduct a thorough evaluation, Dr. Kulkarni concealed the obvious findings, related to the injuries caused by Mr. Papel.

65. Defendant's strategy is to do, exactly the opposite, of what those physicians in the journal articles had done. Dr. Kulkarni begins the visit with "how can I help you today?" Next, she sat five feet away from the patient and remained silent. The Plaintiff had to somehow stimulate a discussion. Plaintiff began with the subject of Verapamil. Dr. Kulkarni's immediate reply was; "Did I prescribe Verapamil"? This was said in a manner to feign puzzlement; extended intonations and long pauses with the words "did" and "I".

66. None of the promises from the head of the practice, relayed by Mr. Lewis, were kept. The true purpose of this visit was to test the patient. Dr. Cochran wanted to stage an experience, similar to what the patient would encounter, with a new physician. Testing; if the patient can explain the facts within 5 minutes and whether any prominent signs of illness are apparent.

Contrivance devised to conceal cardiovascular and vascular injuries

67. Dr. Kulkarni attributes the etiology of the symptoms to a condition known as "Autonomic Dysfunction". The autonomic system is a large part of the central nervous system and thus is involved in nearly every normal and disease process. In contrast, the condition titled "Autonomic Dysfunction", capital A, capital D is truly a psychiatric condition. The set of conditions: Multiple Sclerosis, Chronic Fatigue Syndrome, Gulf War Syndrome, Fibromyalgia; are thought to be primarily of a psychiatric etiology. The primary physical symptoms; fatigue, sore joints, body pain, exist, but are thought to result from inactivity, as is the case with Depression, which is universally regarded as a psychiatric condition.

68. In a manner, similar to the preceding set of maladies, inactivity is a precursor to Autonomic Dysfunction. The primary symptom of Autonomic Dysfunction is that the patients' blood pressure decreases upon standing and continues to decrease for several more minutes. (normally, blood pressure increases upon standing) This, in turn, leads to a strange set of

otherwise, unexplained symptoms.  The condition can afflict those that completely shun activities as is the case with the set of 4 disorders.  In the case of this patient (1) his blood pressure never decreased after he arose, (2) he engages in numerous physical activities (3) his symptoms are attributable to several abnormalities within the circulatory system, primarily, those resulting from the misconduct of Capital Imaging and Alfa Neurology.

69. Dr. Kulkarni suggested that the patient visit a specialist at Johns Hopkins for this strange condition.  Johns Hopkins has such specialists, but they only see pediatric patients.

70. The nearest specialists for adults are at The Cleveland Clinic and at Vanderbilt University, TN.  Dr. Kulkarni tells the patient that it normally takes a few months to be seen by one of these specialty clinics and that would benefit the patient because by that time it would be well into winter.  Did Dr. Kulkarni expect the patient to hibernate for several months?  During the winter, the patient experienced symptoms, attributable to the cardiovascular and vascular systems, that do not occur in other seasons: (1) fatigue while walking in 5 inch deep snow, equal to that of walking in 3 feet deep snow (2) while shoveling snow, having to take breaks every 2 minutes. In 2010, I shoveled for 4 hours, without a single break (in 1996 I could do it in 2 hours, in 2010 I was taking more time for activities but was not in any discomfort) (3) hands get frozen upon touching snow, previously, I used to clear couple of inches of snow off the car with bare hands (4) while walking fast for exercise, sweating in head and chest but, very cold; face, ears, fingers.

71. Dr. Kulkarni does not truly believe that the patient is suffering from this condition or that he would visit these specialists in these far off locations.  The true motive is to mislead other physicians.  A patient would have to have a complete exam and tests from both a cardiologist and a neurologist (Dopplers, etc.) all being unremarkable and no other explanation (Verapamil,

Capital Imaging).  Dr. Kularni sat 5 feet away from the patient, during the visit, never touched the patient, never applied a stethoscope, never referred to a cardiologist.  Dr. Kulkarni made such a huge effort to divert attention, away, from the cardiovascular system, both during the visit and on the related records.  This provided all the clues to the patient as to what he should investigate.  Whenever the patient expressed doubts about the autonomic dysfunction diagnosis, Dr. Kulkarni would argue in a wailing voice, so desperate to mislead the patient.

72.  Dr.Kulkarni did physically touch the patient one time, during the visit.  At the conclusion, when she believed that she had successfully duped the patient, Dr. Kulkarni, cheerfully, shook the patients' hands and wished him good luck.

73.  During the visit, Dr. Kulkarni told the patient that his sweating issue should be treated by a dermatologist.  Dermatologists have treatments to suppress unwanted, sweating.  Had the patient, followed this recommendation, his condition would have moved into the category of acute distress, at rest.  The circulatory system carries 70% of the load of cooling the body.  This system was inefficient and the sweating mechanism that normally carries 30% of the load, took on the additional burden.  I complained about this point to The Board.  The notes from this visit, being created after the patient complained to The Board, does not mention this reckless recommendation.

Dr. Kulkarni is responsible for subsequent harm

74.  The Plaintiff emailed (Exhibit 21, top message) to the practice manager, Mr. Lewis, that no progress was made.  Mr. Lewis did not respond.  The Patient sought diagnosis from another physician.  This physician pointed to the incomplete records and advised Plaintiff to return to Dr. Kulkarni.  Plaintiff sent a letter, addressed to both Dr. Kulkarni and Mr. Lewis; relaying the comments of the physician, that rebuffed diagnosing and treating the patient (Exhibit 22).

75.  September 24, 2013, Plaintiff underwent a routine root canal procedure (Exhibit 23) at office of an endodontist, a dental specialist to whom Plaintiff's general dentist had referred.  The endodontist did nothing wrong, additionally; Plaintiff underwent a similar procedure, one year prior to that visit, with no complications. During the procedure, the anesthetic effects reached beyond the intended location.  One plausible mechanism is that "local nerve block", the name of that procedure; contains epinephrine, for the purpose of constricting blood vessels.

76.  The symptoms for which Plaintiff had established a treatment relationship with Dr. Kulkarni; dizziness, drowsiness, numbness in head, discomfort around the bridge of the nose; permanently, intensified. Driving and working is much more limited.  Night driving is nearly impossible. The Plaintiff had an injury at the bridge of the nose but it had not caused any difficulty with breathing.  In December, 2014, Plaintiff videotaped himself as he slept.  What the video shows is that he has great difficulty with breathing from the left nostril.  He is frequently rubbing and massaging that site, while asleep.  It is a competition between this problem and the uptick in drowsiness. [This is not to be confused with the condition "sleep apnea", where the problems are down in the throat and a patient stops breathing at moments.]

77.  The injuries that Plaintiff suffered to his circulatory system, under Dr. Kulkarni's watch is the proximal cause of this new harm.  Dr. Kulkarni did not treat the earlier harm. Dr. Kulkarni, fraudulently, concealed that earlier harm, preventing the patient and his dentist from considering alternate options.

78.  The patient informed Dr. Kulkarni of this new harm but did not mention the date of the harm.  Dr. Kulkarni enters into the patient records (Exhibit 25) that she provided a "telephone consultation" to the patient on 09/24/14. The patient was engaged with the dental procedure and thus a phone consultation was impossible.

27

Group assembled by Dr. Cochran continues to meet:

79. In mid-November 2013, Plaintiff telephoned Alfa Neurology and asked to speak with Dr. Kulkarni. A nurse answered and informed the patient that "Dr. Kulkarni is in a meeting with some doctors and some other people that I don't know". The formation of this group is more justified at this time, since a complaint was already filed with the state physicians' board, however the Plaintiff was still a patient. Normally, such a group is assembled, after commencement of litigation and the doctor-patient relationship has terminated. The nurse, repeatedly, went to the conference room and asked for someone to speak with the patient. Finally, Mr. Lewis, the practice manager spoke to the patient. Mr. Lewis, initially, said that Dr. Kulkarni was with a patient; however, after the patient revealed that he was aware of the panel, Mr. Lewis, admitted its existence.

80. During the lengthy conversation, the Plaintiff requested that the practice refund the fees. The point was that Medicare would not pay for substandard care. Mr. Lewis responded that this very action is something that the assembled group is considering, as one of their options. The use of the word, "options" provides an insight into the mindset of the assembled group. The group believes that compliance with laws and compliance with the AMA Code of Ethics, are merely, "options".

81. Subsequent to this conversation, Dr. Cochran mailed a letter (Exhibit 6) to the patient, signed by Dr. Cochran and not co-signed by Dr. Kulkarni. Dr. Cochran's points were that: (1) the practice is terminating Dr. Kulkarni's relationship with the patient because sometimes, the doctor-patient relationship does not work well (2) Dr. Cochran would provide "neurological care" for a period of 30 days, ending on December 22,2013 (3) the practice will provide records for continuity of care. A "records request form" was enclosed.

82. Plaintiff telephoned the records clerk.  This records clerk told the patient that for the reasons that his records were short and that the Christmas holiday was approaching, she would waive the fee and would issues the copies, instantly.  The clerk advised the patient that he could either mail the form to the office or visit the office.  Subsequently, Plaintiff mailed the form to the practice.  Allowed 15 days for the release of medical records.  No records arrived.

Patient visited the practice for the sole purpose of obtaining his records

83. December 17, 2013 at 2:00 p.m., presents a newly completed form to the employee at the front desk, Charlene Seegers.  Ms. Seegers was the last employee that the patient spoke with as he was departing the office following his September 13, 2013 appointment.  At that time, Ms. Seegers told the patient in the presence of other employees at the front desk "That's what I like about him, he is always smiling" and added supporting comments.

Large defamatory statement in patient records

84. Ms. Seegers, first, accessed the patient account.  Next, as she was about to print, she noticed a large defamatory statement on the first page of the medical records.  This is the first page of the medical records that would be; sent to another physician, seen by emergency room staff at Inova hospitals. Purpose is to prejudice other physicians, in an effort to conceal misconduct.  Ms. Seegers begins to read the statement, aloud; "This patient has been dismissed from the practice because".  Ms. Seegers continues to read the balance, silently.  Her facial expressions are of shock and disbelief.  It takes 5 minutes to complete reading.

85. Ms. Seegers went to the back of the office and contacted her superiors.  Ms. Seegers did not return, did not want to be a participant in misconduct.  Ms. Joan Anson came to the front and asked the Plaintiff to wait for his records.  There were no patients at the office.  There were no

physicians and no managers in the office. There were nurses and front desk workers, working their shift. The Plaintiff sat, patiently and waited, but remained vigilant to make observations.

86. After 20 minutes, the practice administrator, Carol Jones and 3 police officers, entered via a side entrance, the employee entrance. Nobody at the physical location called the police as there was no reason to do so. The call was placed from an external location, likely, by Dr. Cochran. Ms. Jones went to work that morning, wearing a red overcoat, a representation of Christmas, a week away. Ms. Jones is the manager of the front desk workers and would have to justify her actions to them. Ms. Jones did not seem interested in participating in misconduct but was forced to do so by Dr. Cochran. Ms. Jones presented the records to the patient in a sealed envelope. Dr. Cochran presumed that the Plaintiff would, simply leave and not, inspect and quickly discover that the page numbers were deleted. Dr. Cochran's presumptions are based on arrogance and poor judgment. Such arrogance, that the pages numbers were whited-out with large physical streaks of white-out and the defendant did not bother to photo copy those pages, which would have made the those streaks, invisible. It is possible to see the page numbers through the white-out.

87. The Plaintiff told Ms. Jones that deleted page numbers would not be acceptable to other physicians that may treat the patient. Ms. Jones asked the records clerk to print; the deleted pages were provided. The records were printed 23 minutes apart. The practice could accuse the Plaintiff of adding white-out at some later point, yet what remains irrefutable, 2 sets of timestamps from the printer (Exhibit 17, 11A).

88. During the discussion about the records, the law enforcement officers tilted their heads and stared at the ceiling. This physical act by the law enforcement officers is recognition that the patient's privacy, regarding health records, was violated.

30

89. The Plaintiff asked Ms. Jones as to why the police were called. Her reply was "they are here for something in the back". The Plaintiff was not intimidated and was, in fact, trying to contain laughter. The Plaintiff recognized, many months before this day, that, Dr. Cochran was suffering from a personality disorder and would commit acts of this nature. The events of that afternoon, was an affirmation of the Plaintiff's, prior, assessment. The Plaintiff made the same inquiry of the nearest officer, he did not respond.

## COUNT 1

### Fraud  occurring in Virginia

90. Plaintiff re-alleges and incorporates by reference herein paragraphs 1-89

91. Defendants' employees, often times, poorly executed the orders of Dr. Cochran. They are certainly no counterintelligence agents. Dr. Cochran gave orders to act in an evil, malicious and oppressive manner to his employees; whose personal ethos and training is to help and heal patients. Ms. Jones went out of her way to make a copy of the Plaintiff's records request form, write in "Neurology Reports given to patient", highlighted the statement with a highlighter and then gave the copy (Exhibit 24) to the Plaintiff. Essentially, Ms. Jones is highlighting the fact that Defendant is concealing his complete medical/health records, notably; documentation pertaining to the cardiovascular system.

Fraudulent Records

92. **Medical records, during the time that they are maintained, are in a state of active publication**. In certain circumstances these records may be viewed, even, against the patient's consent. Law enforcement may be given access. A spouse in a divorce proceeding may be given access. An emergency room may access the records. The patient may give authorization to an agency such  Social Security to obtain the records. The publication date is not the date of

input and not the date that records were last disseminated.  Until a time, at which these records
are permanently destroyed, they are in active publication.

93.  At the conclusion of the 03/26/2013 visit; Dr. Kulkarni spent 20 minutes, not inputting
the record for the instant visit, but rather, altering the record from the previous visit.  Dr.
Kulkarni, **boldly, deleted, her order for the very test to which the patient attributed injuries**
(Exhibit 9D).  The other 3 orders, remained. The practice uses EPIC software for record keeping.
This is the "top of the line" and most expensive software, available.  The software generated its
own summary of the orders (Exhibit 9E). Ms. Jones may not have been aware, but Plaintiff
received this page on March 26, 2013. The Plaintiff would not have been administered that MRI
test, without Dr. Kulkarni's orders.  If Defendant were to assert that Dr.Kulkarni, simply
committed the error of, not inputting; then the software generated summary would likewise have
omitted that order. Dr. Kulkarni did things "by the book" during the initial visit because she was
training a medical student. Ms. Jones whited-out the page numbers in an effort to hide the
software generated output. The Plaintiff did not place the white-out, after the fact.  Exhibit 17,
printed at 2:17 p.m.,  is one of the pages given that had the physical streaks of white-out.  At 2:37
p.m. those documents were given to Plaintiff; at which time he protested the alterations.
Immediately, at 2:40 p.m., Exhibit 11A was printed, identical; except no white-out.                           .
A printed summary of each visit was given to the Plaintiff at the conclusion of each visit.
Exhibit 10, for the initial visit.  "Your to do list" is a perfect match of "Future orders" from
Exhibit 9E.  They should match, perfectly, with "Recommendations" on Exhibit 9D.
Neuropsychological evaluation is first on all three.  The second item, MRI does not appear on
Exhibit 9D.  The third and fourth items are in reverse order on Exhibit 9D.

The timestamp for Dr. Kulkarni's signature is the early morning hours of Sunday, January 27, 2013. The software allows the physician to retroactively, input data and timestamp the record for work performed on weekends because the physician may not have access to the software on the weekend. The practice maintains normal office hours. Most physicians add huge surcharges for work performed on weekends. The true explanation for why many of Dr. Kulkarni's entries have timestamps from; late, Friday night, Saturday and early, Sunday morning is that she cannot, retroactively; alter or create new inputs, and give them a timestamp for a time and day that falls within "normal business hours".

94. The final paragraph in Exhibit 9D appears to be in proper alignment; use as a reference. Dr. Kulkarni was shortening the length of lines by pressing "enter" in the middle of sentences. Sentences are continued onto the following line, although significant space was available on the present line. When "enter" is depressed, it is a hard break, caused by the user and not the software. The initial letter of the succeeding line is automatically a capital letter. Dr. Kulkarni, noticed this occurring and changed those capital letters into lower case letters. She missed one. Under the category of recommendations (doctors' orders), the justification for each order is provided. One sentence notes that "he does feel dizzy, lightheaded". The word, "Lightheaded" is intentionally pushed onto the following line. "Lightheaded" is the solitary word, occupying the entire line. Although this section is located towards the conclusion of the record, this is, likely, what she altered, first. Initially, did not notice the appearance of caps. Even within the widening of the margins for some lines the margins are widened, further and the sentences are cut off at unnatural points. On Exhibit 9B the top line reads "Eventually, the". The sentence is completed in the following line and the second line is 300% longer than the first. Similar pattern on Exhibit 9A at lines 7 and 19, under the heading "HPI"

95.  TCD test interpretation: The released record (Exhibits 15A,B) indicates that Dr. Kulkarni completed this report during the late night hours (not normal office hours) of Friday, February 8. The status is marked as "final".  On February 27, Plaintiff obtained a copy of the raw values generated by the test and on that the status was marked "open" (Exhibit 16).  Dr. Kulkarni instructed a nurse, Ms. Latoya Tates to print and release the complete records to the patient on 03/26/13 (Exhibits 9A-9E).  TCD interpretation was not completed prior to 03/26/13.  On 12/17/13, the records were printed at 2:17 p.m. by the records clerk.  The TCD interpretation was printed at 2:35 p.m., following the arrival of the practice administrator, Carol Jones.  One of the following is true: (1) the records clerk was, initially, ordered not to release that portion of the records. (2) these records did not exist at 2:17 p.m on December 17, 2013.  The collections department informed Plaintiff that the "diagnosis codes" were input by Dr. Kulkarni on Saturday, 02/21/13, yet the released records show that the report was finalized on 02/08/13 and included all the diagnosis codes. The font used is thinner and smaller than the font that Dr. Kulkarni used in the other 3 records.  The margins are correctly formatted and thus inconsistent with the other records, where  margins were not correctly formatted.

96.  The records from the 03/26/13 office visit indicate that the record (Exhibits 11A,B) was created at 2:40 p.m.  The same record notes that the patient is to visit a general practitioner and obtain medication to lower blood pressure.  Ms. Tates printed the record from the previous visit at 2:28 p.m.  The patient was physically in the office until 2:32 p.m., at which time he was given a payment receipt (Exhibit 18) Why would Dr. Kulkarni, who had minutes prior, released the records from the earlier visit, not, asked the patient to wait 8 minutes and collect the records from the present visit?  The record with specific instructions to another physician, would that not be the more relevant record to that physician?

97.   The records from 03/26/13 and 09/13/13 (Exhibits 11A, 13A), display some of the same characteristics as the records from 01/24/13: Intentionally, spreading out the text.  The margins are supposed to be 1.5 inches on the sides.  The main paragraph of the 09/13/13 records has the appearance of a "right pointing arrow"

98.   A "summary" was printed at the conclusion of each visit.  "Diagnosis" from the 01/24/13 visit (Exhibit 10) matches the corresponding columns of the doctors' notes (9A).  The same cannot be said for the 03/26/13 and 09/13/13 visits.  03/26/13, the summary (Exhibit 12) does not list "daytime somnolence" yet it appears on the doctors' notes (Exhibit 11A).  09/13/13, no diagnoses appear on the summary (Exhibit 14), yet; "daytime somnolence" and "sweating" appear on the matched column in the doctors' notes (Exhibit 13A).

99.   These facts are additional evidence that the records from 03/26/2013 and 09/13/2013 that were given to Plaintiff on December 17, 2013 were not created on those same days as signed by Dr. Kulkarni but were instead; created in October or November of 2013, in response to a request by the medical board.  The same evidence is consistent with the patient allegation regarding the 09/13/2013 visit.  Dr Kulkarni and the practice, promised medical services to the patient but in reality no medical service was provided.  Diagnosis, the most basic medical service was not provided (Exhibit 14).  The practices' true purpose for the visit was "opposition research".  As a consequence of concealment, the Plaintiff was unaware that he had received severe injuries.  The Plaintiff complained to the Board of Physicians that no service was provided during the September 13, 2013 visit.  In response to The Board; Defendant belatedly, created the records and then added in two diagnoses to show that a service was provided.  Defendant's collections department informed Plaintiff that the diagnosis codes for billing purposes for the September 13,

2013 encounter was input on September 14, 2013. This is a Saturday. The software permits, belated inputting when the service date is claimed to occur outside normal business hours.

100. All three office visit records have hyperlinks (Exhibits 9D, 11A, 13A) for "previous version". This would not appear if a previous version did not exist.

101. Statements that Plaintiff gave Defendant, in writing, are misrepresented. The purpose is to misrepresent Plaintiff's medical condition for the purpose of concealing Defendant's misconduct and consequently, withholding payment for damages to Plaintiff.
Defendant promised, in writing, that issues contained within Plaintiff's letter from July, 2013 would be addressed during the September 13, 2013 encounter. The issues were not addressed and Defendant's own records from that encounter, which are to reflect facts from that encounter, prove this allegation. Defendant had no intention on delivering on that promise. The motive was to stop the Plaintiff from visiting another physician, whereby; evidence would be revealed that would make Defendant liable for monetary damages to Plaintiff.

102. The contract of "doctor-patient" relationship required Defendant to document signs of injury and to report those findings to the patient. Laws exist that require physicians to document and then report to law enforcement; injuries that are consistent with child abuse. The question of; whether a physician complied with such laws do not require extensive analysis as with a question of "standard of care". Obvious signs of injury; is what is at issue. In the case of child abuse, these signs may be a "black eye" and a broken bone. In the case of the Plaintiff and his doctor-patient relationship; the doctor was to document what she witnessed.

103. Dr. Kulkarni examined the Plaintiff on January 24, 2013. On March 26, 2013, her eyes saw that the Plaintiff's blood pressure and heart rate were greatly elevated. Her eyes saw that the Plaintiff had swellings around his eyes. Her eyes saw that the Plaintiff had swollen veins in the

neck and upper chest. Her hands touched the Plaintiff's arm and no pulse was felt. Her ears

heard from the Plaintiff that another medical professional, on February 15, 2013 was behaving as

though, the Plaintiff had suffered a stroke. By analogy, the owner of a car rental company would

expect, at a minimum, that the employee, note; how the appearance and drivability changed in a

car, upon return. The standard would likely be that the employee has to do much more than this

minimum. The minimum expectation is that the employee, to at least, function as an observer or

witness. Furthering the analogy; the employee deletes records, as a means to; deny that such a

car was ever rented out to such a renter. With these facts the owner, may rightfully file charges

for fraud as it relates to the deletion from the records.

104. When the failure to note observations is viewed under this light, then it is clear that those

failures were intentional and a part of a bigger fraud. The records that were released on

December 17, 2013, should accurately reflect the facts of the encounters and additionally reflect

the promises Mr. Lewis made to Plaintiff.

105. Agent of Defendant, Mr. Carey, in writing, stated that his client is Inova Health System.

It was appropriate that Mr. Carey make a demand conveying the wants of his client. Mr. Carey

fraudulently represented that he was authorized by VCU to make a demand of the Plaintiff. Mr.

Carey, fraudulently represented that he was authorized to speak for all Inova and all VCU

employees, when he demanded that Plaintiff not communicate to any one them. What Mr. Carey

is saying is that all Inova and VCU employees, individually, have asked Mr. Carey to inform the

Plaintiff to never communicate with them again. The defendant is the healthcare monopolist in

Northern Virginia. Does this mean that the Plaintiff may not call the front desk of one of their

hospitals, simply to have a call relayed to a patient?

### COUNT 2

**Defamation Per Se      Virginia**

106. Plaintiff re-alleges and incorporate by reference herein paragraphs 1-105

107. It was demonstrated that  records dated 03/26/13 and 09/13/13 were created sometime in November, 2013 after the Plaintiff complained to The Board of Physicians. The Defendant wants the records to convey the message that the Plaintiff has the condition Autonomic Dysfunction. Prior to noting such a diagnosis, a patient undergoes extensive evaluation.  Although Defendant did not even touch Plaintiff, future physicians assume that all testing is over, there is nothing left to evaluate and the patient has this psychiatric condition.

108. What makes this defamation so much worse is that this condition is usually found only in little girls. This man who should be regarded as, at least; a little tough.  After all; he is reporting that he gets cardiovascular symptoms when walking uphill, but instead of calling 911, he goes on with his walk. Added to the fact that he lifts weights, even though that can cause his aortic aneurysm to rupture and kill him.  Added to the fact that dizziness and numbness in the head makes it nearly impossible to change lanes on the expressway, he tries to push those limits as well.  Added to the fact that, although, he had not worked for several years, he jumped, head-first into the job search process.  Added to the fact that he is doing a fairly good job in standing up to a giant monopoly, the Defendant.  Even little girls would think that someone with Autonomic Dysfunction is a "wus".  With that condition, a little girl does not engage in any activities. The lack of activities causes some strange symptoms and then she is, more or less, afraid of her own shadow.  Most of the strange symptoms are just something a child may make up.  With that, the little girl is also seen as little liar; but she is just doing it because she is too timid and fearful.

109. The "neurological report" dated 03/26/14 states: "He continues to notice gait and balance problems".  Then in the section, "physical exam": "gait is normal".  That little girl with

that strange condition reports a symptom such as this which can easily be disproven by with a physical exam. The Plaintiff never reported this symptom. Defendant states that "he continues to notice gait and balance problems". One should be able to turn back to the previous visit and see if Plaintiff reported such symptoms. There is an extensive report from Dr. Kulkarni about what the Plaintiff reported, but there is nothing about him complaining about "gait and balance".

110. September 13, 2014 encounter (Exhibit 13A): the Plaintiff sent a letter and made several statements, in writing (Exhibits 20A,B,C). The physician is to transcribe as much as possible of what the patient is reporting. The patient, already did the work, the physician, simply has to copy it.

(A) the Plaintiff wrote "Problem with contrast administration during MRI", "tech sounded upset", "from that time until I got out of the room, the tech is repeatedly asking me if I am okay, as though I were falling into shock or something similar", "Within 2 days, I notice(d) 2 new problems; cold sensitivity in hands and feet, it was winter at the time, A small bump, 1 inch below each eye-visible to plain sight, cannot notice by touch and no pain". The plaintiff wrote the description of what the tech said the problem was. What the tech said was a complete fabrication but the whatever the patient reports must be in the records. Defendant did not include even a scintilla of this patient reporting.

(B) The Plaintiff wrote "Verapamil, A new symptom had developed. It has been months and the new symptom has not abated" " New symptom- feeling excessively hot and excessive sweating in response", "The new symptom is extreme heat and sweating, mainly from chest, underarms and head. Occurs with minor exertion. 1st feel heat on skin in underarms, then sweating that cools the skin, but inside upper body still feels very hot. If I constantly wipe off sweat, then the sweating process helps to cool inside", "Walking for exercise before sunrise, walking uphill, feel

tired and short of breath, but I remove shirt and wipe sweat off upper body, then I can run fast, uphill, with no problem". "Hair loss accelerated above forehead and top right"

111.  Dr. Kulkarni wrote " he took it (Verapamil) for 5 days and stopped it because of side effects" These were no mere side effects, not temporary and not minor.
" he noticed a sensation of heat in his chest, and he has noticed increased sweating". There is no mention about when it occurs and how severe the symptoms are.  The Plaintiff said "extreme heat from chest and upper body feels very hot" There is no mention about shortness-of-breath. There is no mention that Plaintiff is exercising and is "toughing it out".  The Plaintiff said "accelerated hair loss", not something minor that he just noticed, in passing.
Defendant states "he has noticed high blood pressure and increased heart rate at times". Plaintiff's letter notes no such thing.  Mr. Papel's actions caused blood pressure and heart rate to permanently increase, but those findings were recorded by the Defendant, not something that the Plaintiff, reported.

112.  With that strange little girl, psych condition; the little girl may say that she noticed her blood pressure going up, when any grown-up knows that one cannot tell when their blood pressure is going up; you need an instrument to tell you that.  With that strange condition, when the little girl is inactive, so long;her blood pressure goes down when standing up, the reverse of normal.

113.  The optical illusion: Defendant was not bold enough to write that the impression (doctors' opinion and diagnosis) is Autonomic Dysfunction.  "Impression", which is supposed to have its own column and had such, in the previous two reports; is now, combined with "Plan". Defendant, somehow, gets the words "Autonomic Dsyfunction"  into the Plan section and gives the appearance the it is the Impression.  When physicians review records, they always go straight

to Impression and look for condition names.  How the defendant got those words into Plan is also

notable: The words surrounding "Autonomic Dysfunction" are vague and weak;  "Recommend

**seeing** a specialist in autonomic nervous system **to see if the symptoms**, are **related to that**

114.  Defendant committed fraud within the records.  Defendant committed fraud when

defendant made false promises, in an effort to keep Plaintiff from visiting another physician.

Defendant committed the intentional tort of defamation within the records, that other physicians

and others such as prospective employers would read.  What employer wants to hire a man that is

weaker than a little girl?

115.  As the Plaintiff was showing signs of uncovering the concealment, Defendant did a

180, sticks to the "crazy patient" strategy, but now, instead of being a little wimp, the Plaintiff is

portrayed as a psycho.  Dr. Cochran wrote an overly friendly letter (Exhibit 6) to the Plaintiff.

Dr. Cochran says that he is refunding all fees, as a gesture of goodwill and gives best wishes for

the Plaintiff's future endeavors.   Defendant's collection department told Plaintiff that no

individual has ever been given a refund.  A truly, nonsensical, letter when the facts are that the

Plaintiff suffered severe injuries and was trying to get basic medical care for which the

Defendant held all the keys.  The Plaintiff was not launching an IPO or starting his own

healthcare monopoly.

116.  What was sandwiched in, was the true purpose; evil, malicious, oppression. Dr. Cochran

used a complete paragraph to tell the Plaintiff that the Plaintiff should find a neurologist, right

away and that the Plaintiff should get that neurologist to request the records from Dr. Cochran.

The Plaintiff was trying for months to get records from the Defendant and Plaintiff also informed

Defendant that he visited another physician and that physician needed complete records.  Why

this sudden urgency?  Dr. Cochran gave the Plaintiff $1200 in an effort to get Plaintiff  to

initiate a contractwith a neurologist, so that Dr. Cochran could transmit the defamatory statement to that neurologist.

117.  Plaintiff contacted Defendants' records office and was told that he could get his records, instantly, if he went to the office.  Otherwise, the Plaintiff could mail the request and it would take a few days, but not the 15 days, allowed by law; because "the records are short, not volumes like for some other patients".  Plaintiff waited 15 days and then appeared at the medical practice.  Plaintiff was making great strides to overcome the fraud and defamation contained within the records.  Dr. Cochran, who has never even seen, placed that large defamatory statement within the Plaintiff's health records.  Health records are to be written by the treating physician and at the time that patient was seen.

118.  The large defamatory statement that caused a five minute long physical reaction of shock to Defendant's own employee; was to be the first page that would be seen by the Plaintiff's future physicians, including in an emergency room, where seconds count.  There was amajor news event in Washington, DC in 2006.  Mr. Rosenbaum who lived in the most wealthy neighborhood in Washington, DC was out for a walk after drinking 2 glasses of wine.  He was attacked by robbers and left unconscious.  First responders misunderstood and classified the case as where a homeless person had passed out drunk.  That, initial, misunderstanding, resulted in Mr. Rosenbaum not being treated, even at the hospital.  Mr. Rosenbaum's condition become grave and at that time, it was simply too late to save his life.

## COUNT 3

### Defamation   Virginia

119.  Plaintiff re-alleges and incorporates by reference herein paragraphs 1-118

## COUNT 4

42

### Malicious Prosecution        Virginia

120.  Plaintiff re-alleges and incorporates by reference herein paragraphs 1-119

121.  On December 17, 2013, Defendant called Fairfax County, Va. Police.  Exactly what was told to the police is a matter for discovery.  There is no reason to believe that the police did not act in good faith. Deference was appropriately afforded to a physician who reports on the behavior of a patient. Dr. John Cochran, either; called the police, himself or he ordered an employee to do so. Defendant's employees at 8505 Arlington Blvd. saw no reason to call police. The reality is that Dr. Cochran's misconduct and the false report to the police is what troubled the staff.  Within days; 75% of the non-management neurologists resigned.  That information is evidenced on their website (Exhibit 8).

122.  Dr. Cochran and the Plaintiff have never met, not even spoken on the telephone.  Dr. Cochran would have to say that he is the treating physician and that he is intimately familiar with his patient.  Then give a narrative of historical bad behavior and threatening behavior.  Officer Chang said that they [the 3 officers were late and had other things to do].  Fairfax County Police dispatched 3 officers to enter the office and it would be proper to assume that more were in the vicinity, at a time in which they had other things to do.  This was not the case of officers simply showing up, because they had nothing else to do.  Dr. Cochran would have to report that the Plaintiff is "dangerous" for this level of response.  The officers did not storm in.  They arrived with Ms. Carole Jones, the practice administrator.  She would have debriefed them prior to entrance into the office.  The reporting from the Defendant to the police would have to be: not that the Plaintiff was threatening anyone or was trespassing.  For that, the officers would have entered the waiting room and immediately confronted the Plaintiff.  The police would have to be told that when records are released to the Plaintiff, then he would immediately become violent

and harm others. If it were simply that the Plaintiff would refuse to leave, then at that time, the police could be called. The Defendant could not have the police " on stand-by" unless the Defendant reported that as the Plaintiff's physician they are intimately familiar with the psychology of the Plaintiff and with that background, in the professional judgment of the treating physician, it is likely that the Plaintiff will harm others. After a fender-bender, a physician could not simply request police presence, claiming; "I'm a physician and my skills tell me that people get violent after a fender bender. I will not exchange information with the other driver. The police have to be "on stand-by" because the other drive may go nuts".

123. The Virginia records laws, itself, provides guidance as to when a physician may predict physical threats. The laws for a handgun permit and mental commitments may also be based on a similar principle. For records: a physician may not release the records to the patient. The physician would have to be the **treating** physician, at least, having recently treated the patient. The **treating** physician should have a note already in the records stating that release of records to patient may incite violence. In the case of the Plaintiff there was no such note from Dr. Kulkarni, the treating physician. Dr. Kulkari, the treating physician, last saw the patient on September 13, 2013. The records from that day, with the Autonomic Dysfunction diagnosis, indirectly says; that the patient is a wimp and afraid of his own shadow". Dr. Kulkarni already gave this insulting diagnosis to the Plaintiff, verbally, on September 13,2013 and he did not respond in anger. But ultimately, if you call someone a "wus" and they "kick your behind"; that someone has disproven that he is a "wus" and proven that you are guilty of defamation.

124. The Defendant's own employee heaped praise upon the Plaintiff, on September 13, 2013: "that's what I like about him, he is always smiling". The Plaintiff is not only one in the world who smiles. Ms. Seegers, only noticed, because normally, there is a lot of anger and

fighting at that office; employee versus employee and patient versus employee. On February 1, 2013, the Plaintiff witnessed a 10 minute long argument between one of the Defendant's employees and a food delivery driver. On that same day, the Plaintiff was there for a test and it was conducted by Mr. Eric Parker, a very pleasant gentleman. A year later, on Valentine's Day, that same forty six year old gentleman was charged with 1st degree arson. Someone has gone online to complaint, as to why Defendant allows such a person to be in a room, alone, with a patient for thirty or more minutes at a time. Multiple patient reviews, online, suggest that verbal hostilities are commonplace. There is a very high turnover rate, amongst Defendant's, physicians. Similar information about other employees cannot be recognized by reviewing pages on the internet. During the Plaintiff's first encounter, another patient had arrived late for an appointment, because of the snow and they were dependent on caretakers. As the Plaintiff was in the examination room with Dr. Kulkarni and a medical student from VCU Medical School, literally; hell was breaking out in the reception area. An employee interrupted the Plaintiff's doctors' visit and asked Dr. Kulkarni to help calm the situation. It was appropriate, because Dr. Kulkarni was their superior. What happened, next demonstrates the contrast between the Plaintiff's and Defendant's character. Plaintiff told Dr. Kulkarni that it was okay to interrupt the Plaintiff's care and go help in the reception area. Dr. Kulkarni refused. The gesture by the Plaintiff was rooted in his good character. Additionally, the gesture was a demonstration of Plaintiff's wise judgment that the problem in the lobby had to be solved; ignoring the problem would make things worse for everyone, including the Plaintiff. Five minutes later, whatever was going on in the reception area, did become worse. An employee burst into the exam room, demanding that Dr. Kulkarni, help. Dr. Kulkarni sent the 3rd year female medical school student to resolve the problem. Apparently the medical school student was successful; but mediating a

near-riot between patient's caretakers and an employee that should have been handled by a superior of the employee, not some student in a short lived mentorship program. The true motive for the false report to the police was to break the bond of friendship between the Plaintiff and the Defendant's employees. The Defendant wanted to shut off the conduit that may have helped the Plaintiff to discover more evidence of misconduct.

125. Defendant's letter to Plaintiff was very friendly. Defendant wrote that Plaintiff would be a patient until December 21, 2013 Defendant's Records office told Plaintiff that he could come in person and collect records. Plaintiff was acting in a lawful manner as he waited for records on December 17, 2013. **Unknown to Plaintiff, Defendant told police that Plaintiff would be trespassing after the time that he is given his records. Defendant never told Plaintiff that he was trespassing**. Defendant said that police were there "for something in the back". After defendant was given the envelope, Defendant's order was triggered, that Plaintiff is trespassing; but Plaintiff was not warned. Defendant put visible white-out on the page numbers and that is fraud. Plaintiff made the reasonable request of Defendant to produce documents without white-out. Defendant complied. It was reasonable that Plaintiff inspect documents for fraud.

126. Defendant gave police false information about Plaintiff's medical condition; saying that physicians have diagnosed him to be criminally, violent. Defendant did not inform police about the severe physical injuries that the Plaintiff had suffered in 2013. Defendant did not tell police that prior to those injuries, Plaintiff already had a medical condition. Defendant's own employee, Dr. Kulkarni, the Plaintiff's only treating physician, had written as her expert opinion that only one condition (Exhibit 9A) stood out and was worthy of treatment. No other conditions were identified. That one condition, difficulty and very slow with visuospatial tasks was first identified by a clinical psychologist. That psychologist did not diagnose the Plaintiff with any

mental illness. The testing administered to identify this condition requires the patient to complete tasks that involve a mix/match of numbers and letters. If the patient cannot complete the test, at all; then it is a dementia type problem. In the matter of the Plaintiff, the problem was with speed. This means that the Plaintiff could fully comprehend and find the fraud within his records. He would simply need more time to do so.

127. With the new injuries of 2013, he needed, even more time. With the hostile environment, surrounded by police, he needed yet more time; the evaluation for that condition includes components for attention and concentration. The Plaintiff was inspecting the documents, but made no progress beyond recognizing that the page numbers were no longer being concealed. The Defendant did not tell the Plaintiff that he must leave. The Defendant did not tell the police, that the Plaintiff needed additional time. The Defendant did not tell police that Defendant released documents with fraudulent contents. The Defendant did not tell police that the Defendant only released "neurological reports" and not "complete medical (health) records"; which was to be the trigger charge the Plaintiff with the crime of trespass. The crime of trespass is not one which an officer finds on his own. The property owner sets the rules. The police were acting in good faith, but the Defendant provided false information to the police. **According to officer Chang, the crime of trespass had already occurred**. It was because " I (Officer Chang) did not want to arrest anyone today" that the Plaintiff was not arrested and formally charged. The **Plaintiff was already, verbally, charged by Officer Chang**. An act of "nolle prosequi" by Officer Chang occurred, at that point. Officer Chang told Plaintiff, "You got your records, then leave". In reality, Plaintiff did not get his records. At best, Defendant handed Plaintiff some papers. **Defendant misled police to think that those papers were Plaintiff's records**.

## COUNT 5

### False imprisonment     Virginia

128.  Plaintiff re-alleges and incorporates by reference herein paragraphs 1-127

129.  On December 17, 2013, Defendant, by means of misrepresentation, held Plaintiff at Defendant's office, beyond 2:17 p.m. The health records that Defendant, intended to release to Plaintiff was printed at 2:17 p.m. but Defendant told Plaintiff that the health records were not ready and to wait. Defendant gave false information to police and they arrived. The police, physically surrounded the Defendant, albeit, at a short distance; with the positioning to physically restrain the Plaintiff at their, will. It was reasonable that when an individual is the subject of a complaint to police, that he not leave without the permission of the police. Following the verbal charge of trespass by the Commonwealth, the Plaintiff inquired of the police if he was free to leave and left only after the officer replied, "yes". Defendant told the police that Plaintiff was a psycho. Defendant implied that Plaintiff was similar to the individual responsible for the Virginia Tech Massacre. It is a fact that in Fairfax County, Va., there is more sympathy towards the victims of that crime than to the greater number of victims from 911. There is more fear of the disgruntled shooter than a terrorist attack. The majority of students at Virginia Tech are children of Fairfax County. The police response to the Defendant's call for service was greater than that for a stalker. It was reasonable for the Plaintiff to "play it safe", after all he was the victim of a false complaint to police by a giant monopoly in Fairfax County. It was reasonable for Plaintiff to fear that if it remained in Fairfax County, the police may think that he is planning to return to Inova and do harm. The false imprisonment of the Plaintiff began at 2:17 p.m. and concluded when he exited from the jurisdiction of the Fairfax County Police.

130. So restrained was the Plaintiff; that he could not carry out a technique that helped him improve his driving ability. His driving ability was hampered by his disability. This compromise threatens public safety. The two professions that society expects to keep the public safe from such a threat, were the very two professions that caused this situation to occur. Contained within the medical records (Exhibits 9A,B), signed by Dr. Kulkarni, his treating physician and employee of Defendant are the statements, as follows:

"He has noticed some issue with hand-eye coordination. He is driving okay in regular traffic, but if he is on the highway for 20 to 25 minutes, then he feels like his left eye feels sleepy and that he feels dizzy. If he rests, then he can drive again for 20 to 25 minutes. If he lies down for 20 minutes, then he can work of 3 more hours. A psychology evaluation found that he had some issue with visual processing." Impression (diagnosis): He has difficulty with visuospatial tasks and he has some difficulty doing the same task repeatedly for a while".

131. Authoritative sources cite that individuals with difficulty with visuospatial tasks, have difficulty with driving. The testing evaluates for visual scanning, numeric sequencing, visuomotor speed, visual-motor coordination and visual-spatial ability adequate enough to understand on an on-going basis the alternating pattern of numbers and letters. The impaired patient will take a much greater amount of time to complete the test.

132. The Plaintiff had, previously, informed Dr, Kulkarni that there was a minor fender bender, related to this issue that occurred on a Beltway off ramp. The Plaintiff informed Dr. Kulkarni and Dr. Cochran, several times, in writing, that, as a consequence of the harm suffered by the patient in 2013, these symptoms intensified since that reporting by Dr. Kulkarni on 01/24/13. The Plaintiff arrived at the practice for the purpose of collecting his medical records. He expected that he would sit for a few minutes, essentially resting, while his records were being prepared. He would collect the records and possibly rest a few more minutes in his car and then proceed to drive home. The route is the entirety of the top portion of the Washington Beltway, an interstate highway. The patient lives 24 miles away from the practice, 22.5 miles of this route

is composed of The Beltway. The patient had already reached his limit, when he had arrived at the practice. The patient never had a chance to rest. The practice released records with page numbers, intentionally, concealed. The patient had to examine those records for other alterations, then, he had to examine the second set of records for alterations. Defendant presented Plaintiff to be equal to a school shooter, a murderer of children. Defendant had actually pulled 3 police officers off the streets at a time in the afternoon, when children are dismissed from school. The suite, physically, closest to Inova Alfa Neurology is a pediatric practice that treats children with serious and terminal medical conditions. These were all doctors' offices, primarily staffed with mothers of young children. Within this setting; Defendant set lose a "homicide by cop" strategy. "Suicide by cop" is when a suicidal individual creates a set of circumstances, whereby that individual is killed police. In like fashion; Defendant created a set of circumstances, that if it were not for the good character and judgment of the Plaintiff, tragic consequences may have resulted. Defendant forced a patient who was unable to drive; to drive; with the possibility of causing harm to children and others.

## COUNT 6

### Defamation Per Se    Maryland

133. Plaintiff re-alleges and incorporates by reference herein paragraphs 1-132.

134. Plaintiff is a Maryland resident, Inova is a monopoly in Northern Virginia. The defamatory items are primarily intended to be seen by physicians in Maryland.

## COUNT 7

### Defamation    Maryland

135. Plaintiff re-alleges and incorporates by reference herein paragraphs 1-134.

## COUNT 8

50

**Tortious Interference with contract and business expectancy in Maryland**

136. Plaintiff re-alleges and incorporates by reference herein paragraphs 1-135.

137. Plaintiff continued to frustrate Defendant's misconduct.  The majority of Defendant's own physicians, resigned; in disgust.  Plaintiff sent a letter (Exhibit 31) to Dr. Cochran that the Plaintiff withdraws from any arbitration agreements that he may have, inadvertently; signed and that the Plaintiff intends to uncover the facts.  Dr. Cochran, whose conduct up to this point, was indistinguishable from King Herod of the Bible or Cruella Deville, was undaunted and pressed forward with; evil upon evil, maliciousness upon maliciousness, oppression upon oppression. Defendant has understood that Plaintiff will seek legal representation for medical malpractice action, against both; Defendant and Mr. Papel.

138. Defendant understands that Plaintiff would need to obtain an attorney specializing in medical malpractice, who would accept the prospective action on a contingency basis. Even if the attorney worked "pro bono", there are large expenses that are to be paid to medical experts. There are 4 elements to a medical malpractice case.  The first 2 are "duty" and "standard of care".  Defendant's efforts to misrepresent fact regarding those 2 elements have failed, backfired and made matters worse for Defendant and invites action for punitive damages.  The 4th element is economic damages.  Although Plaintiff was not working and did not have dependents; substantial evidence exists that had the standard of care not been breached in 2013, Plaintiff would have been highly likely to be in possession of those pursuits.  Defendant, being a giant, regional, healthcare monopolist, decided that if Defendant could interfere with Plaintiff's perspective and actual contracts with future physicians; Defendant could, in turn, interfere with that prospective contract with a medical malpractice attorney and the subcontract with medical experts.  The 3rd element is evidence of injury. Plaintiff sustained injuries and these injuries

produce economic damages, additional to "loss of income". One of the known injuries is an aortic aneurysm. Authoritative sources state that; this condition will worsen and that preventive surgery is expensive and has risk of death. The same sources state, that when the aneurysm reaches the endpoint, catastrophic damages occur, at that time, the initial care alone would exceed one million dollars. The federal government is the payer of last resort. Medicare, Medicaid, and ACA rules, emphasize that providers are to identify iatrogenic injuries caused by breach of standard of care and to make the responsible party, pay. These laws and the corresponding implementation are still in their infancy, but the trend is that spirit behind these laws is a top priority for the taxpayer and the federal government.

139. Defendant had until this time; released records that contained fraud and defamation, in an effort to thwart Plaintiff from being correctly diagnosed and treated for his injuries. The friendly communication from Mr. Lewis, making sure that Plaintiff did not visit any other physician. The friendly communication from Dr. Cochran, overemphasizing; the necessity of Dr. Cochran, directly placing misinformation into the hands of Plaintiff's future physicians. Defendant was aware that Plaintiff had filed a complaint with The Board in early October, yet; Defendant did not terminate the doctor-patient contract. Normally, once a physician is aware that a complaint has been filed, they will immediately, terminate the contract. Defendant did not terminate the contract at that time because in this way Defendant could "keep tabs" on Plaintiff. It was only after Defendant realized that Plaintiff was gaining access to Defendant's employees with this open channel, that Defendant terminated the relationship. Defendant changed the name of the practice from Inova Alfa Neurology to Inova Medical Group Neurology. Previously "Alfa" was emphasized and the internet address was "alfaneurology.com"; Inova was not in the

"domain". The change in name may be seen as an effort to vicariously, intimidate other physicians from, stepping on the toes of the giant monopolist.

140. When Plaintiff sought to continue care in Maryland, the fraudulent records already produced a "dog whistle": brother, please cover for us and if that does not do it, we are big, bad, Inova, we'll make sure that your career and practice, go nowhere. When judging by the outcome of the Plaintiff's contracts with physicians in Maryland, there would have to be more than a tacit "dog whistle".

141. When a patient is harmed by a physician, a medical board, which is composed of physicians seldom find fault with the wrongdoer. With civil action for medical malpractice; the plaintiff pays a large fee to the expert physician to take his side. What is not a case of "that's just how things are" is for a subsequent treating physician to conceal severe injuries to a patient. The type of injuries that's found on the Plaintiff. The type of injuries, that by concealing; additional severe harm would result.

142. The records that Dr. Kulkarni created from the initial visit serves as a model. Ultimately she adulterated that record, but many items remained that did not interfere with the substance of the facts. There is an extensive description of history prior to that visit. What had precipitated Plaintiff's illness was that another physician was careless with an instrument. Dr. Kulkarni reported the matter in a diplomatic manner, calling in a mistake. Plaintiff did not expect more than that. Several years later, while being treated for the original condition, the condition transformed following the use of a drug that was mainly, appropriately prescribed. Again; Dr. Kulkarni reported this event, making it seem that the patient was to blame. Regardless of who was to blame, Dr. Kulkarni gave recognition to the event. Dr. Kulkarni is a neurologist and her record from that visit contains evidence of a complete neurological physical.

143. The Plaintiff formed a doctor-patient relationship with Dr. Aroor Rao in Lanham, MD in February, 2014. Plaintiff paid the full fee charged to a self-pay patient. Dr. Rao is a cardiologist. Dr. Rao misrepresented facts during that visit. Dr. Rao, grossly misrepresented facts within the records (Exhibit 26A, B) that he released. The most egreicious act is that the records did not contain any part of the basic physical exam, let alone; any parts of the cardiovascular exam. Absolutely zero, is what was reported. The basics; weight, blood pressure, heart rate; are not reported. Dr. Rao gives the diagnosis that the Plaintiff is overweight and has high blood pressure. The record would at least have to show the weight and the blood pressure, but Dr. Rao gave, absolutely nothing. Dr. Rao is concealing the entire physical exam. Dr. Kulkarni avoided examining the Plaintiff after injuries occurred to his cardiovascular system. Dr. Rao conducted the examination that Dr. Kulkarni, intentionally failed to conduct; but then concealed the findings. The Plaintiff's contract with Dr. Rao, included creating and releasing complete medical records was breached. UCSD Medical School has a guide that is available online. This guide gives instructions about how to conduct the different types of physical exams. There are Youtube videos, as well. All this is "don't try this at home material". One needs the skill, training and experience of a physician to complete these examinations. The patient, however; understands enough to keep his physician, honest.

144. In April, 2014; Plaintiff attempted to create a doctor-patient relationship with Horizon . Vascular. Plaintiff spoke to Horizon and Horizon said that they have appointments available. When the Plaintiff gave Horizon his name, Horizon, without giving a reason, said that they would call the Plaintiff back. That call never came.

145. In May 2014, Plaintiff succeeded in establishing a doctor-patient contract with Jeffrey Dormu, D.O. A single physician practice that Defendant had not corrupted. Dr. Dormu

explained to the Plaintiff how Mr. Papel had harmed the Plaintiff. Plaintiff never suggested to Dr. Dormu that Dr. Kulkarni had done anything wrong. Plaintiff, simply stated that his condition became much worse after taking the drug, Verapamil. To which; Dr. Dormu replied: "Even doctors make mistakes". It appears that following the initial visit, Dr. Dormu, likely initiated contact with Defendant. From that point forward, Dr. Dormu joined in on the "bury the patient, alive" strategy. When the Plaintiff requested complete medical records, verbally, Dr. Dormu; stalled. Plaintiff called Dr. Dormu's office and informed them that Plaintiff would like to come to office and complete the records release form. Dr. Dormu's practice, intentionally, gave Plaintiff the wrong form (Exhibit 28A). The form given was for obtaining records from another practice and giving it to Dr. Dormu. When Plaintiff asked for the proper form, the practice replied that they don't have such a form.

146. Plaintiff, himself, modified the given form and then Dr. Dormu released records. Plaintiff received care from Dr. Dormu during three separate encounters in 2014; May 5, June 16 and June 23 (Exhibits 28E,F,G). Dr. Dormu released a single consolidated report, dated June 14 (Exhibits 28B,C,D). When Plaintiff challenged Dr. Dormu's practice, stating that the standard, for medical records is that of Medicare. Medicare requires a separate record for each encounter. The record must be complete and there should be no "boiler plate". Dr. Dormu's practice told Plaintiff that Dr. Dormu "releases an overall record for all his patients" Plaintiff enquired as to how a report dated June 14, 2014 could possibly include summaries of two encounters that had not yet occurred? This of course; left them dumbfounded. They were dumfounded when Plaintiff enquired as to how Dr. Dormu obtained blood pressure and other measurements of the patient on a holiday.

147. Dr. Dormu titled the record "consultation" and at the conclusion of the record placed the statement "Thank You for allowing me to assist in the care of your patient". Plaintiff had an independent doctor-patient relationship with Dr. Dormu. This was not some sort of subcontract work that Dr. Dormu was doing for another physician. Dr. Dormu's staff would be dumbfounded, again, if the Plaintiff asked them to identify who the word "your" refers to. Not only did Plaintiff have a treatment relationship with Dr. Dormu but all fees were paid by the Plaintiff.

148. As Dr. Rao had done , Dr. Dormu failed to fulfill his obligations for which Plaintiff paid him. After months of prodding Dr. Dormu released one more piece; the raw results of a diagnostic test. Significant items were withheld but the records that Dr. Dormu released provides all the evidence needed to prove that Mr. Papel did what Plaintiff alleges.

149. Where Dr. Dormu was elusive was with regard to Plaintiff's cardiovascular system, has had been previously done by Dr. Rao and Dr. Kulkarni. Dr. Dormu states that Plaintiff had a past diagnosis of poor circulation, when that diagnosis was, in fact, a contemporaneous diagnosis made by Dr. Dormu. "Poor circulation" is vague diagnosis. Plaintiff does not have hypertension and does not have atherosclerosis; so after some math is done; then one can conclude that it is the heart that is the cause of poor circulation. The physical exam of the lungs: Dr. Dormu states auscultation: good airflow. Normally, if airflow was good and sound was normal; the report is to state that lungs are clear. Dr. Dormu, intentionally neglected to mention "sounds" because Plaintiff has made a recording with a sound from his lungs (coarse crackles) that is recognized as a sign of heart failure. The report states that there is no bilateral, JVD (Jugular Venous Distention). Dr. Dormu does not note if there is unilateral JVD. Unilateral and bilateral JVD are

56

both signs of heart failure.  Dr. Dormu states that the engorged veins appear on the left upper arm when anyone can see that these engorged veins appear on both sides of the upper chest.

150.  Plaintiff, recognizing that Dr. Cochran and that taxpayer funded multibillion dollar entity are intent of blocking Plaintiff's access to basic medical care; sought help from his church. Some may turn to their church for all their problems, but the Plaintiff thought that his church could help him.  After all; that church is the Seventh Day Adventist Church and cardiovascular care is the claim to fame at their local hospital.  Inova, using taxpayer funds had assembled that "death panel" and they had some sort of private investigation taking place, as well.  The Plaintiff, who made an effort to limit his "web profile"; recognized that in September 2013 and in December, 2013, there was there was extensive web searches using his name.  Defendant gathered the information about Plaintiff's church.  Apparently, one large healthcare entity made a request of another large healthcare entity to frustrate Plaintiff's efforts in obtaining basic medical care. Plaintiff was not seeking anything more than what is expected from a 4th year medical school student; history taking and physical exam in the first 15 minutes and 10 minutes of diagnosis and recommendations.

151.  Plaintiff sent an email to the pastor of his church. Rather than offering any assistance, the pastor had a sermon that was already prepared for this occasion.  Defendant expected that Plaintiff would go thorough this channel, early in the process.  Plaintiff, instead; went through this channel as a last resort.  Plaintiff, smelling a rat, avoided that church and later viewed the sermon, online.  The sermon, essentially, said; if people have anxiety, they should pray to God for help and if they keep worrying; Satan will come and get them.  Consequently, they will get insomnia and cardiovascular disease.  Exhibit 32 is the main points about that sermon, found on that church's website

152. The Plaintiff had a problem, staying awake. His circulatory system problems appeared, instantly, caused by the actions of medical professionals. Plaintiff never expressed that he suffered any anxiety. Plaintiff had only asked the pastor give the Plaintiff a recommendation for a cardiologist who would not be compromised by Dr. Cochran. If this was the pastor's diagnosis, he should have given a recommendation for a psychologist. Whatever, be the etiology, all pastors give the obligatory; I'm praying for you! This pastor never responded to the Plaintiff's emails; even after Plaintiff questioned him about his; motives, junk science and absurd interpretation of straight forward verses from the New Testament of the Bible.

153. Plaintiff gained coverage with health insurance that pays 100% of all medical expenses. Funding originates at the federal level but the State of Maryland is charged with administering the program within Maryland. Maryland has about 8 contractors that directly act as the insurer to the insured. This "set-up" is organized under the principles of both "patient rights" and the governments' desire to use funding, effectively. Federal law, as administered, is for these contractors, known as MCOs to proactively get patients into the doctors' office, give the patient a complete physical, identify medical conditions, design a treatment plan. The MCO that the Plaintiff selected is Medstar Family Choice. Medstar is an entity that is larger that Inova. Medstar bought out several doctors' offices and Anjana Dhar, M.D. was assigned to be Plaintiff's primary care physician. Plaintiff had to wait seven weeks, for an appointment. Plaintiff gave all the records that he had to the practice and requested that they gather complete records from Dr. Dormu

154. On October 15, 2014; the "physical" was conducted. Plaintiff goes prepared with a pair of sweat shorts, was ready to decline a true "complete physical". Dr. Dhar never conducted anything that would be regarded as a physical. Dr. Dhar checked the eyes, ears and nose with a

scope and light; and that took, one minute. However; Dr. Dhar was with the Plaintiff for one full hour. Dr. Dhar understood the full history within the first 3 minutes. Exam of the body would have taken another 5 minutes. Patient would get dressed. Dr. Dhar would go into her office and take 10 minutes to complete the records and produce the doctors' orders. Dr. Dhar spent a full hour, in the role of, agent for the Defendant. Dr. Dhar would ask a question and then "cut off" the reply, just before the facts were presented. Whenever the Plaintiff was able to speak over her interruptions and give facts as to how those injuries that Plaintiff has been complaining about is causing significant disruptions to his life; Dr Dhar would respond: "Why does it have to be because of that"? Difficulties, such as; difficulty with driving on the highway at night. That Plaintiff exits that highway and he can drive a little better, then he re-enters the highway at a later point and within five minutes he is forced to exit, again and continue with this pattern. Dr. Dhar asked detailed questions about family medical history. She persisted on this subject for 10 minutes and not the normal 1 minute.

155. When the Plaintiff asked for records, Dr. Dhar's office put up some resistance, including; saying that the records are Dr. Dhar's "personal notes" and that there is nothing in the records other than what was discussed during the encounter. Those records (Exhibits 29A-E) note that Dr. Dhar billed Medicaid for a complete physical exam. None of the history from 2013 is reported. The history prior to 2013 that Dr. Kulkarni had, mainly, reported, accurately and thoroughly, is now reported in an abrupt and grossly, untruthful manner. The total history as reported is that; the Plaintiff has had extensive evaluations for a variety of neurological complaints by Drs. Bhatti, Jaitly and Kulkarni. The portrayal is that, either; because of a psychiatric condition or that he is a malingerer, the patient makes these things up. The truth was that the Plaintiff had minimal contact with physicians during the eight years prior to visiting Dr.

Kulkarni. Dr. Bhatti was an ENT and not neurologist. Dr. Bhatii found injuries within the nasal and sinus region that was evidence of a head injury and the Plaintiff's complaint of daily migraines was reasonable and not a "variety of symptoms". Then with Dr. Jaitly, the symptoms transformed during the course of medications. All this was well reported by Dr. Kulkarni.

156. Dr. Dhar reported that the patient's heart and lung sounds were normal; when she had never touched the patient or used a stethoscope. Dr. Dhar reported that patient denies fever. Actually, the patient's previous records showed that his normal temperature was 98 degrees. Dr. Dhar's employee measured temperature at the start of the visit and it was nearly 2 degrees, higher than normal; a fever. The fever that Dr. Dhar did not notice, because she never touched the patient; persisted for a month. At that time Plaintiff sought treatment for that condition, alone, at Medstar Prompt Care.

157. The diagnoses that Dr. Dhar placed within Plaintiff's medical records, appeared on a print-out given to the patient (Exhibit 29E). The lead diagnosis should have been the "aortic aneurysm" because in an ER, a patient would present with symptoms, identical to a heart attack and that misdiagnosis would lead to a preventable, painful, death. The second diagnosis should have been Superior Vena Cava Syndrome because that explains the Plaintiff's daily disability; difficulty with driving and work.

158. Dr. Dhar, not only did not give these two diagnoses, she listed a set of diagnoses, that would lead one to believe that the Plaintiff is at high risk for a heart attack. Nine diagnoses appear: the leading four being; obesity, family history of ischemic heart disease, high cholesterol and high sugar. The Plaintiff's weight is 205. The Plaintiff discussed the reason for this weight with Dr. Dhar. Plaintiff told Dr. Dhar; that when her employee weighed the Plaintiff, the employee had guessed that the weight was 165. The Plaintiff had the same experience with

others. The additional weight is not fat. The weight is edema. Edema is large deposits of fluids within the body. Unlike fat, much of it is hidden. With several cardiovascular abnormalities, blood returning to the heart "backs up" and this gets deposited into the upper body. Plaintiff told Dr. Dhar that his father suffered a heart attack at age 52 because of a poor diet and no exercise; that he is fine at age 76 and his parents lived into their nineties. Plaintiff does not have high cholesterol. His LDL/HDL ratio is normal. Plaintiff told Dr. Dhar that his sugar is a little elevated because he eats fig bars and oatmeal raisin cookies throughout that day. He only started eating in this manner in 2013 as a way to improve functioning in activities, such as driving which was severely diminished by the injuries of 2013. Dr. Dhar was given the results of a CT of the heart that states that Plaintiff has zero calcification and that he has less of an atherosclerosis process that 100% of men in his age group (Exhibits 27A-F).

159. If the Plaintiff were to someday suffer severe chest pains and arrive in the ER; his file would not mention the aortic aneurysm which would likely be the source of chest pains. The file would, instead; say that he is at high risk of a heart attack. The Plaintiff would have a better chance of surviving a trip to the ER, with no records; at all. The **creation of this record by Dr. Dhar is, by far, the most evil, single, act that is contained within this pleading. It is not plausible that a physician would go to this extent to protect the Defendant, without a request from the Defendant**. The Defendant commenced with a "bury the patient alive" operation and engaged in multiple schemes to influence the contracts of the Plaintiff. Defendant's "bury the patient alive" objective is easily seen in Dr. Dhar's actions.

160. Four other diagnoses are parts of more severe conditions that Dr. Dhar does not want to acknowledge. The remaining diagnosis of headache is something Plaintiff told Dr. Dhar, that he does not have. Defendant treated the Plaintiff with a drug for phantom migraine headaches that

aggravated his cardiovascular injuries. Dr. Dhar has created this false diagnosis, in an effort to show that Dr. Kulkarni had cause, for treating with that drug, Verapamil.

All of Dr. Cochran's Schemes involve tortious interference with contracts of others:

161.   The contract of doctor-patient relationship, contract of licensure by a professional organization; supersede that of a physician and his employer. This is especially true when the physician is not at the management level of his employer's business. Dr. Cochran interfered with such contracts of Dr. Kulkarni. Policies on "running up the bill" and concealing problems were to be the domain of Dr. Kulkarni. When a physician terminates a doctor-patient relationship; the duty is hers; to inform the patient about the termination of that contract. In the case of Dr. Kulkarni, she did not even co-sign the termination letter. State licensing boards and private boards, such as The American Medical Association sanction the individual physician and not the business.

162.   Dr. Cochran forced physicians, from both the neurology practice and from other divisions of Inova to participate in his "death panel". Three out of four physicians at the epicenter of these efforts, resigned. These physicians understood that, although, they have contracts with Inova, a part of that contract; cannot order them to violate their contractual obligations to other parties. It is not characteristic of physicians to participate in a scheme to harm a patient

163.   When one says that the police were acting in good faith, it is inherent that they breached laws and rules and "good faith" absolves them of responsibility. Dr. Cochran brought about those breaches

164.   Fraud within the Plaintiff's medical records. Creating the appearance within those same records that Plaintiff suffers from some strange psychiatric condition. The strongly worded,

cover-sheet defamatory statement.  The purpose of these; were to interfere with Plaintiff's

current and expectant contracts with treating physicians, malpractice attorneys and the

subcontracted medical experts.

165.    Dr. Cochran's sentiment that was conveyed by Defendant's attorney, is that; Dr.

Cochran has the right to interfere with third parties, such as Virginia Commonwealth University.

Dr. Cochran interfered with VCU's complaint process. This is not characteristic of VCU.

166.    The misconduct of physicians and healthcare entities in Maryland with which Plaintiff

established a contract and the actions of similar, prospective parties; where the Plaintiff is either;

blacklisted or, where the diagnostic and record keeping process is compromised; is not

characteristic of those parties.

167.    Defendant Inova provides; the "muscle", the funding and the stature for Dr. Cochran to

coerce other parties to do his "dirty work".  Plaintiff had earlier argued that the name of the

practice was changed from Inova Alfa Neurology, where "Inova" was deemphasized to Inova

Medical Group Neurology Services in what could be interpreted as an effort to intimidate

physicians who may help the Plaintiff.  Plaintiff, in the past, had suggested that the practice was

named "alfa" by Dr. Cochran because he sees himself as the "alpha".  A Wikipedia definition for

"alpha" [in social animals]:

individual in the community with the highest rank.  Other animals in the same social group may
exhibit deference, alphas usually gain preferential access to desirable items or activities.  Alphas
may achieve their status by means of superior prowess and/or through social efforts and building
alliances

168.    A large healthcare entity, Adventist Healthcare had a scheme in place [via the

Plaintiff's pastor, no less] to discourage Plaintiff from forming a contract with them.  A large

medical practice, Horizon Vascular Specialists had a scheme in place to discourage Plaintiff

from forming a contract with them.  Dr. Rao's is the head of a large cardiology practice and he

breached his contracts with both the patient and with the professional associations.  It in notable that Dr. Dormu, initially, was not being coerced by Defendant because Defendant had not predicted that Plaintiff would make a contract with Dr. Dormu.

169.   The actions of Dr. Dhar could be seen as akin to being a hitman. Dr. Dhar put misinformation into the Plaintiff's medical record, that if he presented to an emergency room with chest pains caused by a damaged aorta, he would, instead; be treated for a heart attack and that would, most likely, result in his death.

170.   Defendants actions have caused irreparable, harm. Defendant, intentionally, engaged in those actions for the purpose of foreclosing on Plaintiff's opportunities to obtain, meaningful and appropriate, healthcare services within the Washington, DC area.  Inova is the monopoly that controls access to healthcare in Northern Virginia.  Adventist Healthcare is a large entity in Suburban Maryland.  Dr. Dhar's employer, Medstar is the largest healthcare entity in the Washington and Baltimore areas.

## COUNT 9

### Tortious Interference with Contract and Business Expectancy in Virgina

171.  Plaintiff re-alleges and incorporates by reference herein paragraphs 1-170.

## COUNT 10

### Civil Conspiracy in Virgina

172.  Plaintiff re-alleges and incorporates by reference herein paragraphs 1-171

173.  The "death panel" was a group of Inova employees and "some other people  (the nurse) does not know"

## COUNT 11

### Civil Conspiracy in Maryland

64

174. Plaintiff re-alleges and incorporates by reference herein paragraphs 1-173

## COUNT 12

### Intentional Infliction of Emotional Distress in Virginia

175. Plaintiff re-alleges and incorporates by reference herein paragraphs 1-174

176. Plaintiff asserts that Defendant sought to cause psychological injury as a means to, both; destroy Plaintiff's will to pursue the Defendant and to cast the Plaintiff in a negative light; if signs of a psychiatric condition appeared. Plaintiff believes that he has overcome these attacks and does not have any psychiatric condition. Should Defendant allege that; all that is going on is that the Plaintiff has a psychiatric condition, then, facts are; the psychiatric condition is a direct consequence of Defendant's actions. Alternately; if the Defendant knew that a psychiatric condition, already existed, then Defendants actions are all the more, egregious. The records from the initial visit indicates that Dr. Kulkarni ordered a modified version on a neuropsychological examination; simply test for attention and concentration. Normally a neuropsychological examination includes a psychiatric component. Dr. Kulkarni went out of her way to exclude psychiatric testing. Plaintiff declined to complete the modified neuropsychological examination and the MSLT (daytime sleep study). On September 13, 2013, the final encounter; Dr. Kulkarni eliminated the need for even that version, that was limited to attention and concentration, which would have been conducted by a psychologist. For MSLT, Dr. Kulkarni notes "Recommend MSLT, patient is not keen on doing the test". There is no recommendation for any testing that is conducted by a psychologist.

## COUNT 13

### Intentional Infliction of Motional Distress in Maryland

177. Plaintiff re-alleges and incorporates by reference herein paragraphs 1-176

## PRAYER FOR RELIEF

Plaintiff seeks the following:

A.  Jury Trial

B.  Appointment of counsel

C.  Permission to Amend Complaint

D.  Preliminary order to Defendant to release Plaintiff's "Complete Health Record".  The Virginia Board of Physicians has interpreted the applicable Virginia law and states: "definition is expansive".  The definition will include all tangible items, most notably; that large defamatory statement that caused a prolonged reaction of shock to Ms. Seegers, previous versions of records, items related to the "death panel", items sent to The Board,

E.  Preliminary order for Defendant to indentify and give an accounting of how Defendant has funded it's actions against the Plaintiff.  The "death panel", how and what were they compensated?

F.  Order to amend health records to accurately reflect what Plaintiff submitted in writing

G.  . Compensatory damages for $2,000,000 in Virginia

H.  Compensatory damages for $2,000, 000 in Maryland

I.  Punitive damages as determined by the Court   Laws of Maryland.  Sufficiently large that Defendant dismisses Dr. Cochran and takes corrective actions that bring Inova into compliance with it's own mission statement and of what is expected of a large non-profit, taxpayer funded healthcare entity;

G.  Punitive damages as determined by the Court   Laws of Virginia

Respectfully Submitted,

Dated December 24, 2014

Joseph R. Crussiah
Pro Se Plaintiff
9701 Cottrell Terrace
Silver Spring, MD 20903
Montgomery County
240-475-7737
crussiah@yahoo.com